Opinion
 

 KENNARD, J.—
 

 A jury convicted defendant Manuel Mendoza of one count of residential robbery (Pen. Code, § 212.5),
 
 [1]
 
 four counts of robbery (§ 211), three counts of kidnapping for purposes of robbery (§ 209, subd. (b)), two counts of commercial burglary (§ 459), one count each of forcible rape (§ 261, subd. (a) (2)) and arson with great bodily injury (§ 451), and murder (§ 187, subd. (a)).
 

 The jury found true allegations that defendant inflicted great bodily injury on a person over the age of 60 years during the commission of the residential robbery, the forcible rape, the arson, and the murder. (§ 1203.09, subd. (a).) The jury also found true the special circumstance allegations that defendant committed the murder during the commission of robbery, rape, and arson. (§ 190.2, subd. (a)(17)(A), (C), (H).) Defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)
 

 I.
 
 Facts and Proceedings
 

 Defendant was convicted in this case of crimes based on four separate events, which we discuss below.
 

 
 *149
 
 A.
 
 Guilt Phase
 

 1.
 
 Prosecution’s Case
 

 a.
 
 Robbery of Jung Wang
 

 At 4:00 p.m. on February 5, 1986, Jung Wang was working at Mickey’s Liquor on Huntington Drive in Los Angeles when a man pointed a gun at Wang and demanded money. The man took about $20 in cash lying next to the cash register and left, and Wang called the police. Wang identified defendant as the robber in a photographic lineup, a live lineup, at the preliminary hearing, and at trial.
 

 b.
 
 Kidnapping and Robbery of Piedad Saiz, Maria Galvez, and Leo Pena
 

 At 2:20 a.m. on February 6, 1986, after closing her bar, La Copa de Oro, on Huntington Drive in Los Angeles, Piedad Saiz left with Antonio Duran, Maria Galvez, and Leo Pena. As they walked towards Saiz’s car, a white 1983 Buick Regal, a man asked for a ride to North Broadway, saying he had run out of gas. Saiz turned him down. Saiz and her companions entered the car. As Saiz started to drive away, the man hung onto the passenger door. When Saiz stopped at a traffic signal a few blocks away, the man got into the backseat while brandishing a gun. He ordered Saiz to continue driving. After traveling three to four blocks, the man ordered everyone out of the car and told Saiz to leave the key in the ignition. He then lined everyone up on the sidewalk and ordered them at gunpoint to turn over their purses and wallets. Saiz, Galvez, and Pena complied; Duran did not. The man drove away in Saiz’s car. Saiz and her companions then walked to Huntington Drive, where they flagged down a police officer.
 

 In a photographic lineup and at a live lineup, Saiz identified defendant as the kidnapper and robber. Pena identified defendant at a photographic lineup and at trial. Duran was unable to identify defendant at trial. Galvez did not testify.
 

 Patricia Saldivar, a friend of defendant’s, testified that on the morning of February 7,1986, she saw defendant drive a white car that she thought might have been a white Regal Cutlass. Defendant said the car was his mother’s. That same morning, Ann DiPrima, defendant’s girlfriend, saw defendant drive a white Monte Carlo or Regal, which defendant said he had taken from a bar. On February 10, the police found Saiz’s white Buick Regal parked in front of DiPrima’s home.
 

 
 *150
 
 c.
 
 Burglaries of Chung Hing News and Ying On Association
 

 At 6:00 p.m. on February 6, 1986, Ha Luong, president of the Chung Hing News on West Bernard Street in Los Angeles, locked the office and left. The next morning, he discovered that the office had been burglarized. Taken were a sound mixer, a drum set, two speakers, three amplifiers, two or three microphones, a guitar, and a bass.
 

 At 2:00 a.m. on February 7, 1986, Joseph Wong, president of the Ying On Association, located above the Chung Hing News, locked and left the office. At 8:30 that morning, the burglary of the office was discovered. Missing were five guns registered to certain members of the association, firecrackers, a television, a video cassette recorder (VCR), $200 in cash, and 30 unopened cartons of cigarettes.
 

 When Patricia Saldivar saw defendant on the morning of February 7, 1986, there was a set of drums in the backseat of the car he was driving. That same morning, defendant’s girlfriend, Ann DiPrima, saw drums and music stands in the trunk of the car defendant was driving. Defendant also had a gun, later determined to belong to a member of the Ying On Association that had been burglarized on February 7. Defendant left 15 cartons of cigarettes at DiPrima’s house as well as a bag of firecrackers. Defendant told DiPrima that he had obtained the items from Chinatown. DiPrima thereafter found in her backyard two large speakers with Chinese writing on them.
 

 d.
 
 Rape, Robbery, Arson Causing Great Bodily Injury, and Murder of Mary Frances Litovich
 

 On February 7, around 1:30 p.m., Philip DiPrima, the father of Ann DiPrima, defendant’s girlfriend, confronted defendant, who was in Ann’s bedroom, about the recent theft of three guns from the DiPrima’s home. DiPrima told Ann to call the police. When DiPrima asked defendant, “Why are you stealing from me?” defendant answered that he needed money to support his cocaine habit. When DiPrima asked if there was a gun in the case defendant was holding, defendant told him there was. DiPrima then told defendant he had a choice between going out the window with the gun and taking his chances with the police or letting DiPrima help him get into a drug rehabilitation program.
 

 By that time, Officer Stephen Perry of the Alhambra Police Department had arrived outside the house. DiPrima convinced defendant to follow him through the house and out the front door. As they came out of the front door, Officer Perry told defendant to put his hands up. Defendant dropped the gun
 
 *151
 
 case, ran back into the house, went out a side door, and climbed over a fence.
 

 Officer Perry radioed for assistance and gave the police dispatcher a description of defendant. Officer Richard Hinds and Officer Bruce Nyquist helped Officer Perry search the neighborhood for defendant. Officer Nyquist saw a man matching Officer Perry’s description climb a fence on Stock-bridge Avenue.
 

 Between 1:30 and 2:00 p.m., defendant came through the back door of his friend Patricia Saldivar’s house on Poplar Street near Stockbridge Avenue. When he left, defendant asked Saldivar to water down the cement in the back of her house so that dogs could not smell his scent.
 

 During the search for defendant, Officer Hinds was checking the 3600 block of Stockbridge Avenue when Mary Frances Litovich came out of her home and told him that her dog and several other dogs in the neighborhood had been barking. Officer Hinds told her to go back into the house.
 

 When Philip DiPrima told Officer Perry that he did not want to press charges against defendant, Officer Perry called off the search at 2:02 p.m. and the police left the area.
 

 Between 2:00 and 3:00 p.m., Richard Davila and Rudy Alarcon were in front of Litovich’s house on Stockbridge Avenue when they heard an explosion and a woman scream “help me” three or four times. When the men saw smoke streaming out of a window on the side of the house, they went to the house to try to fight the fire. Through a window, Davila saw Mary Frances Litovich lying on a bed semi-nude and struggling unsuccessfully to get up. The mattress, curtain, and walls were on fire; the flames around the bed were about a foot high. Davila found a hose in the backyard and aimed it through the window in an attempt to soak down the bed. After his efforts to reach Litovich inside the house were unsuccessful, Alarcon helped Davila in hosing down the fire. They were then joined by Jaime Villanueva, James Zito, and a neighborhood boy.
 

 Soon after the fire was reported at 2:40 p.m. firefighters arrived and put out the fire. Arson investigator Anthony Jakubowski determined that a water-soluble flammable liquid, such as rubbing alcohol or cooking sherry, had been poured over the bed and distributed throughout the room and then ignited with an open flame.
 

 Around 3:30 p.m., homicide detective Raymond Dance of the Los Angeles Police Department arrived at the crime scene. In the living room Dance saw
 
 *152
 
 a television, a VCR, and other items stacked in the middle of the floor. A Polaroid camera and a camera box were on the chair in the dining room. In an unoccupied bedroom, jewelry and watches were scattered across the floor. In the bedroom containing Litovich’s body, dresser drawers had been pulled out and items of jewelry and clothing were on the floor.
 

 Detective Dance examined Litovich’s badly burned body. She was lying on her back on a twin bed, with her blouse and bra pulled above her breasts. Her right wrist was tied to one bedpost with the electrical cord from a lamp, while her left wrist was tied to the other bedpost with the electrical cord from a clothes iron. The electrical cord from a clock was looped around her neck. The cords were still attached to the appliances.
 

 Elizabeth Morales, who resided on Sheffield near Stockbridge Avenue, testified that at 2:40 p.m. on the day of the fire she saw defendant walk down her driveway carrying a camera case and Polaroid camera film.
 

 Between 2:00 and 3:30 p.m., Luz Castellanos arrived at her home on Winchester. When she opened the door of a bathroom attached to the garage, she saw a person lying facedown on the floor; she asked a neighbor to call the police. When Luz Castellanos’s sister, Beatrice, came home between 3:30 and 4:00 p.m., she looked in the bathroom; no one was there, but the shower was muddy and the floor was wet. The cover was off the toilet tank, and two boxes of Polaroid film were floating inside the tank.
 

 At approximately 3:50 p.m., Robert Espinosa, his brother Mike, and Richard Quezada were in a car at the corner of Poplar Street and Stockbridge Avenue, when they saw defendant run by them with a camera case. Defendant was wet from the waist up and the camera case he was carrying was wet. He appeared nervous and scared. The three men immediately drove to the scene of the fire at Stockbridge Avenue and reported their observations to Officer Bruce Spalding. Defendant was arrested shortly afterwards. When arrested, defendant was clutching a wet camera case full of jewelry, and bills totaling $20 to $25 were found on the ground nearby. Margaret Catalano later identified the jewelry as belonging to her mother, Mary Frances Litovich, the murder victim in this case.
 

 Defendant was taken to the Hollenbeck police station and placed in a holding cell. When Officer Milton Hernandez stopped by the cell, defendant said “I burned up your momma. Did you find my boots under her bed?”
 

 A week after his arrest, defendant telephoned his friend Rene Cardozo from jail and asked Cardozo to tell the police that Cardozo had given him the
 
 *153
 
 jewelry found in his possession at the time of his arrest. Cardozo refused to do so.
 

 The autopsy established that the victim’s death was caused by smoke inhalation, burns, and compression of the neck. She had suffered a blunt injury to her chest. She had been alive when the fire was started.
 

 Allison Ochiae, a criminalist with City of Los Angeles, detected spermatozoa on two slides containing vaginal samples apparently taken from the victim during the autopsy, shortly after her death. The semen had been deposited 12 to 24 hours before the samples were taken. Ochiae was unable to determine whether the semen was defendant’s.
 

 Fingerprints lifted from the Buick car belonging to kidnap and robbery victim Saiz, from the house of murder victim Mary Francis Litovich, and from the bathroom in the Castellanos’s garage did not match defendant’s.
 

 2.
 
 Defense Case
 

 Defendant did not present evidence at the guilt phase of the trial.
 

 B.
 
 Penalty Phase
 

 1.
 
 Prosecution’s Case
 

 At the penalty phase, the prosecution introduced evidence that defendant had twice assaulted his girlfriend, Ann DiPrima; that he had shot and robbed Francisco Lopez; and that he had his brother assault a witness, Richard Garcia.
 

 Ann DiPrima testified that on January 8, 1986, defendant pulled her from a parked car, hit her with his fist, ripped her shirt, and threw her to the ground. As she lay on the ground, defendant kicked her in the back. A few months later, defendant pointed a gun at her while she was standing on the porch of her home, knocked her to the floor, and threatened to shoot her.
 

 She also testified to events relating to the robbery and shooting of Francisco Lopez. On February 1, 1986, defendant, DiPrima, Vincent Guillen, and Richard Garcia were at an apartment in El Sereno. Defendant said he wanted to commit a robbery. The four of them then left the apartment. When they came to an alley off Huntington Drive near the Copa de Oro bar, a man walked towards them. The man was staggering and appeared to be intoxicated. DiPrima and Garcia stopped walking while
 
 *154
 
 defendant and Guillen continued down the alley. Ten minutes later, DiPrima heard a gunshot. Shortly afterwards, all four returned to the apartment. Defendant produced a $20 bill and some $1 bills that he said came from the man in the alley. He mentioned that on the way he had dropped a gold chain.
 

 Richard Garcia and Vincent Guillen corroborated Ann DiPrima’s testimony about the robbery and shooting of Francisco Lopez.
 

 Francisco Lopez testified that on February 1, 1986, he left the Copa de Oro bar at 11:00 p.m. As he walked down a nearby alley, a man demanded money in Spanish. The man then placed a gun against Lopez’s chest and fired. Lopez later discovered that his gold chain, a watch, a $20 bill and eighteen $1 bills were missing.
 
 [2]
 

 Richard Garcia, who had been with defendant shortly before and after the robbery of Francisco Lopez, testified that two weeks after the robbery defendant telephoned him from jail and told him not to say anything to the police. A week later, on February 20, 1986, defendant again called Garcia from jail and told him he had read Garcia’s statement to the police and defendant was “going to send hit men.” On April 14, defendant’s brother Felix punched Garcia twice in the mouth for “ratting” on defendant.
 

 2.
 
 Defense Case
 

 At the penalty phase, the defense presented the testimony of defendant’s mother and one of his sisters.
 

 Mary Mendoza, defendant’s mother, testified that defendant was born on June 14, 1965; he was the second oldest of seven children. Defendant’s father, an ironworker, was a violent alcoholic. Once, when defendant failed to catch a grocery bag his father threw at him, the father beat him with a thick leather belt. After the beating, defendant’s behavior changed. He became uncontrollable, ran away repeatedly, and began using drugs. Mary Mendoza begged the jury to spare her son’s life.
 

 Sylvia Mendoza, defendant’s older sister, testified to the numerous beatings, “maybe three times during the week and especially during the weekends,” the children suffered at the hands of their father. She recalled the beating incident her mother had earlier described to the jury, and said that after that beating defendant underwent a “complete change.” She asked the jury to spare defendant’s life.
 

 
 *155
 
 II.
 
 Pretrial Issues
 

 A.
 
 Substitute Counsel
 

 Defendant contends that during pretrial proceedings, when he asked for the removal of his appointed counsel, the trial court committed reversible error by failing to afford him a meaningful opportunity to explain the specific reasons for his dissatisfaction with counsel, as required by
 
 People
 
 v.
 
 Marsden
 
 (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].
 

 1.
 
 Proceedings
 

 When defendant was arraigned in February and March 1986, he was represented by the Los Angeles County Public Defender. On April 2, 1986, the trial court appointed Charles Lloyd and Gerald Lenoir as defendant’s counsel. Almost a year later, on March 13, 1987, Attorney Lenoir and defendant appeared at a hearing to set dates for pretrial motions.
 

 At the commencement of the hearing, the trial court asked defendant if he would agree to a continuance because of the absence of Attorney Lloyd, who was in court in another city. Defendant answered “no,” adding, “I would like to dismiss my counsel.” The following colloquy then occurred:
 

 “[The court]: You want to dismiss your counsel? Then we have to talk about that separately.
 

 “[Defendant]: I would like to represent myself.
 

 “[The court]: You want to represent yourself?
 

 “[Defendant]: I have been thinking about this and wrote up a motion on it and I was going to bring it here and give it to the bailiff to give it to the court clerk.”
 

 Through questioning, the court ascertained that defendant had a high school education, had not been examined by mental health professionals, and was 22 years old. The court warned defendant of the dangers of self-representation, and stressed that he would not be entitled to any special consideration just because he was representing himself.
 

 When the court told defendant that self-representation would not be in his best interests, the following exchange occurred:
 

 “[Defendant]: I feel I’m not getting a defense.
 

 
 *156
 
 “[The court]: Your trial hasn’t even started yet.
 

 “[Defendant]: But I don’t know anything about my case.
 

 “[The court]: Have you had a chance to talk to Mr. Lenoir and Mr. Lloyd?
 

 “[Defendant]: I haven’t had a chance to.
 

 “[The court]: You think that is part of the problem?
 

 “[Defendant]: I do.”
 

 The trial court suggested to Attorney Lenoir to have the case “put . . . over a week,” so he and Attorney Lloyd could discuss the matter with defendant. Defendant reiterated his desire to represent himself, saying, “regardless of anything, I am going to go pro per. I have decided already.” The court continued the hearing for March 20, 1987, “for further motions relating to pro per, possible Marsden hearing; and we’ll proceed at that time.” This was also reflected in a minute order dated March 13, 1987.
 

 At the March 20, 1987, hearing, the trial court noted that defendant had completed a printed form to proceed in propria persona, supported by a four-page handwritten motion. After ascertaining that defendant understood the risks of self-representation the court had mentioned at the March 13 hearing, the court granted defendant’s motion to represent himself and, at the prosecutor’s suggestion and defendant’s request, appointed Attorneys Lloyd and Lenoir as standby counsel.
 

 At a hearing on April 7, 1987, held at his request, defendant informed the court he had reached an agreement with Attorneys Lloyd and Lenoir for them to be cocounsel while defendant continued to represent himself. Defendant and the attorneys agreed the attorneys “would be the ones actually handling the matter in court” and filing “all the motions” while defendant would represent himself “primarily for his accomplishing certain research and preparation on behalf of his case.” The court appointed Attorneys Lloyd and Lenoir counsel of record, stating that the court “would be relying upon counsel of record, Mr. Lloyd and Mr. Lenoir, to represent [defendant] fully.”
 

 2.
 
 Propriety of Trial Court’s Actions
 

 When a criminal defendant seeks substitution of counsel on the ground that appointed counsel is providing inadequate representation, a trial court must give the defendant an opportunity to explain the reasons for the
 
 *157
 
 request. (See, e.g.,
 
 People
 
 v.
 
 Crandell
 
 (1988) 46 Cal.3d 833, 854 [251 Cal.Rptr. 227, 760 P.2d 423];
 
 People v. Marsden, supra,
 
 2 Cal.3d at pp. 123-125.) Although no formal motion is necessary, there must be “at least some clear indication by defendant that he wants a substitute attorney.”
 
 (People
 
 v.
 
 Lucky
 
 (1988) 45 Cal.3d 259, 281, fn. 8 [247 Cal.Rptr. 1, 753 P.2d 1052].) Here, defendant did not do that. As just discussed, at both the March 13 and March 20, 1987, hearings, defendant expressed in no uncertain terms to the trial court his desire to act as his own attorney. And at the March 20 hearing, defendant presented the court a written request for self-representation.
 

 When defendant at the March 13 hearing made a fleeting reference to dissatisfaction with counsel because he was “not getting a defense,” the trial court pointed out that the case had not yet proceeded to trial. When the court suggested putting the matter over a week to give defendant and his counsel a chance to discuss the matter, defendant insisted that “regardless of anything, I am going to go pro per,” adding “I have decided already.”
 

 Given defendant’s insistence on self-representation, the trial court was under no obligation to conduct an inquiry into any dissatisfaction defendant might have with his appointed counsel so as to necessitate substitution of counsel.
 

 B.
 
 Effectiveness of Defense Counsel at Pretrial Proceedings
 

 Defendant contends his trial counsel rendered inadequate representation, in violation of his right to counsel under the Sixth Amendment to the federal Constitution and under article I, section 15 of the California Constitution. The Attorney General argues that because defendant was representing himself, he may not allege ineffective assistance of counsel. Generally it is true that a defendant who elects to be his own attorney may not thereafter seek a reversal of his conviction based on incompetent representation.
 
 (Faretta
 
 v.
 
 California
 
 (1975) 422 U.S. 806, 834-835, fn. 46 [95 S.Ct. 2525, 2541, 45 L.Ed.2d 562].) But as we noted earlier, the two court-appointed attorneys acting as defendant’s cocounsel retained control oyer pretrial and trial proceedings. As to those aspects of the representation over which counsel retains control, counsel remains responsible for providing constitutionally effective representation, and the defendant may assert a claim of ineffective assistance of counsel.
 
 (People v. Jones
 
 (1991) 53 Cal.3d 1115, 1142 [282 Cal.Rptr. 465, 811 P.2d 757];
 
 People v. Hamilton
 
 (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701,
 
 774
 
 P.2d 730].) Because defendant here is challenging the adequacy of his counsel’s performance in the trial court, he may raise that claim on appeal.
 

 
 *158
 
 Citing well-established law, we recently reiterated that a defendant claiming ineffective representation “must show both that his counsel’s performance was deficient when measured against the standard of a reasonably competent attorney and that counsel’s deficient performance resulted in prejudice to defendant in the sense that it ‘so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.’
 
 (Strickland
 
 v.
 
 Washington
 
 (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674]; see also
 
 People
 
 v.
 
 Wader
 
 (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].)”
 
 (People
 
 v.
 
 Kipp
 
 (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) Because after a conviction it is all too easy to criticize defense counsel and claim ineffective assistance, a court must eliminate the distorting effects of hindsight by indulging “a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ [Citations.]”
 
 (Strickland v. Washington, supra,
 
 466 U.S. 668, 689 [104 S.Ct. 2052, 2065].)
 

 With these principles to guide us, we address defendant’s claim of ineffective assistance of counsel based on counsel’s failure to cross-examine witnesses at the preliminary hearing, failure to move to dismiss the arson special-circumstance allegation, and failure to maintain confidentiality in requesting defense funds.
 

 1.
 
 Counsel’s Failure to Cross-examine Arson Investigator at Preliminary Hearing and Failure to Move to Dismiss Arson Special Circumstance
 

 Defendant faults his counsel for not cross-examining arson investigator Jakubowski at the preliminary hearing. He argues that such examination would have disclosed that the flammable liquid used to set the fire at the house of murder victim Litovich was placed only on the bed next to the victim’s body, not in other parts of the room. Defendant asserts that this disclosure at the preliminary hearing would have enabled the defense to . move to strike the arson-murder special circumstance “on the grounds that no structure or property was burned with felonious intent independent of the intent to kill the victim.”
 

 When, as here, a defendant after conviction asserts error at the preliminary hearing, the defendant must “show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination.”
 
 (People
 
 v.
 
 Pompa-Ortiz
 
 (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Defendant here has not attempted to
 
 *159
 
 show prejudice separate from the trial proceedings. (See
 
 People
 
 v.
 
 Williams
 
 (1988) 44 Cal.3d 883, 923, fn. 19 [245 Cal.Rptr. 336, 751 P.2d 395].) Accordingly, we will not consider his claim of error at the preliminary hearing independent of our evaluation of alleged trial error discussed below. (See
 
 post,
 
 at pp. 183-184.)
 

 2.
 
 Defense Funding Requests
 

 Section 987.9 allows an indigent defendant in a capital case to seek court funds for, among other things, the hiring of investigators. Under the statute, “the fact that an application has been made and the contents of the application shall be confidential.”
 
 (Ibid.)
 
 As relevant here, the first of two defense requests sought investigative funds for an amount not to exceed $1,000. The second request sought reimbursement for $775.43, based on the defense investigator’s efforts to contact certain witnesses whose names and addresses were listed in the funding request. Defendant argues that both requests violated section 987.9 because they were not filed as confidential applications.
 

 A violation of section 987.9 is not reversible per se, however. The defendant must show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the violation.
 
 (People v. Anderson
 
 (1987) 43 Cal.3d 1104, 1133-1134 [240 Cal.Rptr. 585, 742 P.2d 1306].) Here, defendant has not made such a showing.
 

 C.
 
 Prosecution’s Motion to Consolidate Charges and Defense Motion to Sever Charges
 

 Defendant contends the trial court erred in consolidating charges brought against him in four separate cases and in denying his motion to sever the Jung Wang and Saiz robbery counts from the Litovich murder charges. We disagree.
 

 1.
 
 Proceedings
 

 Defendant was-charged with a number of offenses in four separate cases. In case No. A778709, defendant was charged with 12 counts based on: the robbery of Jung Wang; the crimes of robbery and kidnapping of Piedad Saiz, Maria Galvez, and Leo Pena; the rape, robbery, and murder of Mary Frances Litovich, and the arson of her house. In case No. A777687, defendant was charged with two counts of burglarizing the residence of John and Lucy Campos. In case No. A779116, defendant was charged with the robbery and attempted murder of Francisco Lopez. And in case No. A798662, defendant
 
 *160
 
 was charged with the commercial burglaries of the Ying On Association and the Chung King News.
 

 The prosecution moved to consolidate all the charges. Defendant unsuccessfully sought to sever the Jung Wang and Saiz robbery counts from those relating to the Litovich murder. The trial court consolidated the counts involving Jung Wang, Saiz and her two companions, the Ying On Association and Chung King News, and Mary Frances Litovich. The court refused to consolidate the charges stemming from the robbery and attempted murder of Francisco Lopez and the burglary of the Camposes’ home. Defendant contends the consolidation violated the statutory requirements for joinder of counts, and in any event was an abuse of discretion by the trial court.
 

 2.
 
 Statutory Requirements
 

 Section 954 provides that an accusatory pleading may “charge two or more different offenses connected together in their commission
 
 ... or
 
 two or more different offenses of the same class of crimes or offenses . . . .” (Italics added.) Defendant argues the trial court violated this statute because the consolidated offenses do not meet either requirement of the statute. We disagree. The consolidated offenses are sufficiently “connected together in their commission”
 
 (ibid.),
 
 as we discuss below.
 

 Offenses “committed at different times and places against different victims are nevertheless ‘connected together in their commission’ when they are, as here, linked by a ‘ “common element of substantial importance.” ’ [Citations.]”
 
 (People
 
 v.
 
 Lucky, supra,
 
 45 Cal.3d at p. 276.) Here, the close time frame within which the consolidated offenses were committed shows a continuing course of criminal conduct. The Jung Wang robbery occurred at 4:00 p.m. on February 5, 1986; the Saiz robberies and kidnappings were committed the next day, at 2:20 a.m.; the commercial burglaries were perpetrated either during the evening after the Saiz crimes on February 6, or early the next morning; the Litovich robbery, rape, and murder occurred on the afternoon of February 7, between 2:00 and 3:00 p.m. The Jung Wang robbery, the commercial burglaries, and the Litovich robbery all involved the intent to illegally obtain property. In this case, as in
 
 People
 
 v.
 
 Lucky, supra,
 
 45 Cal.3d at page 276, the “ ‘element of intent to feloniously obtain property runs like a single thread through the various offenses. . . .’ [Citations.]”
 

 When, as here, the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant’s severance motion.
 
 *161
 

 (People v. Marshall
 
 (1997) 15 Cal.4th 1, 27 [61 Cal.Rptr.2d 84, 931 P.2d 262];
 
 People
 
 v.
 
 Price
 
 (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].) In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling.
 
 (People v. Price, supra,
 
 at p. 388.) The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.
 
 (People
 
 v.
 
 Marshall, supra,
 
 at pp. 27-28.)
 

 Defendant correctly notes there was no cross-admissibility of the evidence of the robbery of Jung Wang, the Saiz counts, the two commercial burglaries, and the Litovich charges of rape, robbery, murder, and arson. Although cross-admissibility ordinarily dispels any inference of prejudice
 
 (People v. Arias
 
 (1996) 13 Cal.4th 92, 126 [51 Cal.Rptr.2d 770, 913 P.2d 980]), the absence of cross-admissibility does not by itself demonstrate prejudice.
 
 (People v. Memro
 
 (1995) 11 Cal.4th 786, 850 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Accordingly, we proceed to evaluate the remaining factors set forth in the preceding paragraph.
 

 There was strong evidence against defendant on each of the consolidated counts. Robbery victim Jung Wang identified defendant as the perpetrator in a photographic lineup, a live lineup, and at the preliminary hearing. Two of the victims of the Saiz counts identified defendant as the perpetrator of the robberies and kidnappings; thereafter two witnesses saw defendant driving Saiz’s car, and the police found Saiz’s car parked in front of defendant’s girlfriend’s house. Also, on the morning of the two commercial burglaries, property taken during the burglary of the Chung King News was seen in Saiz’s car while defendant was driving it, and defendant gave his girlfriend some of the property taken during the burglary of the Ying On Association. As to the counts relating to the Litovich murder, defendant was seen hiding from the police less than a block away from the Litovich home immediately before the crimes were committed. After discovery of the fire at the Litovich home and while the efforts to extinguish it were still underway, defendant was seen one block from the fire with the victim’s property in his hands. At 5:25 p.m., after his arrest, defendant admitted to Officer Hernandez having “burned up” Litovich.
 

 The strength of the evidence as to each of the consolidated counts shows that here we are not dealing with weak charges being joined with stronger
 
 *162
 
 charges so as to alter the outcome of some or all of the charged offenses. That the evidence against defendant on some of the counts consisted of eyewitness statements and on other counts was circumstantial does not establish improper consolidation of charges. Direct evidence is neither inherently stronger nor inherently weaker than circumstantial evidence. Although the counts relating to the Litovich murder included special circumstance allegations, the capital charges were independent of the Jung Wang robbery count, the Saiz robbery and kidnapping counts, and the commercial burglary counts. The capital charges were not the result of joinder of the various incidents.
 
 (People
 
 v.
 
 Sandoval
 
 (1992) 4 Cal.4th 155, 173 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Nor were the consolidated theft-related charges unusually likely to inflame the jury against defendant. The counts likely to inflame a jury against defendant pertained to the Litovich murder, and they were sufficiently distinct from the consolidated counts as to render the likelihood of prejudice minimal.
 

 Defendant has failed to show that the trial court abused its discretion by consolidating the various charges and by denying his severance motion. Nor has defendant shown that the consolidation resulted in a trial that violated his right to due process, an issue we discuss below.
 

 3.
 
 Due Process
 

 Even if a trial court’s severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the “defendant shows that joinder actually resulted in ‘gross unfairness’ amounting to a denial of due process.”
 
 (People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at p. 127.) In support of his contention that the consolidation of charges rendered his trial fundamentally unfair, defendant points to the prosecution’s introduction of evidence at trial of gang membership, the trial court’s failure to instruct the jury on its own motion that evidence of one crime is not to be considered as evidence of other crimes, and the trial court’s jury instruction on the use of eyewitness testimony.
 
 [3]
 
 We reject defendant’s argument.
 

 At the hearing in response to the defense argument that evidence of gang membership supported severing the charges, the prosecutor stated “there is absolutely no evidence of gang membership on the part of the defendant, nor
 
 *163
 
 do we ever intend to put any evidence of such gang membership on.” Thereafter, at trial, the prosecutor asked robbery and kidnapping victim Piedad Saiz what defendant had said when he was hanging onto her car door during the incident. She responded that defendant said he was “a homeboy and that he had his friends around someplace.” She later testified that she understood the term “homeboy” to mean, “Well, a gang.” The defense timely objected to the latter question as immaterial. The trial court, however, overruled the objection on the ground that the question was relevant to show that Saiz’s state of mind was that of fear at the time of the offenses. Leo Pena, who had been with Saiz during the crimes and was himself a victim, also testified that defendant said he was a “homeboy” and that “he had people around him.” Then, during closing argument the prosecutor referred to robbery victim Jung Wang’s description of defendant’s hair as “combed back like Cholo style, gang style.” These comments and those by the witnesses were fleeting and minor; they therefore did not result in gross unfairness so as to amount to a denial of defendant’s constitutional right to due process.
 

 Equally unavailing is defendant’s assertion that the trial court should, on its own motion, have instructed the jury that evidence of one crime may not be used as evidence of another offense. We have held that neither policy nor precedent favors a rule requiring a trial court to instruct the jury sua sponte to disregard evidence of prior criminal offenses or prior criminal conduct.
 
 (People v. Milner
 
 (1988) 45 Cal.3d 227, 251-252 [246 Cal.Rptr. 713, 753 P.2d 669].) Here, the consolidated offenses were factually separable. Thus, there was a minimal risk of confusing the jury or of having the jury consider the commission of one of the joined crimes as evidence of defendant’s commission of another of the joined crimes. Also, because of the absence of any appreciable likelihood of prejudice, we reject defendant’s contention that defense counsel’s failure to request such an instruction constituted ineffective assistance of counsel. (See
 
 People
 
 v.
 
 Hawkins
 
 (1995) 10 Cal.4th 920, 942 [42 Cal.Rptr.2d 636, 897 P.2d 574].)
 

 We also reject defendant’s claim that the trial court’s instruction on eyewitness testimony rendered his trial grossly unfair. The instruction told the jury: “Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crimes charged.” (CALJIC No. 2.92 (1984).) This instruction was preceded by an instruction on having to find the defendant guilty beyond a reasonable doubt, and to find him not guilty if there was any reasonable doubt as to his identity. (CALJIC No. 2.91 (1982 rev.).) In light of these instructions, a reasonable juror would have understood the challenged “eyewitness testimony” instructions to apply only to those offenses on which eyewitness testimony was presented at trial.
 

 
 *164
 
 III.
 
 Jury Selection
 

 Defendant contends the jury selection process violated his federal and state constitutional rights to counsel, to a jury trial, to due process of law, and to reliable guilt and penalty verdicts. (U.S. Const., 5th, 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, & 17.) Grounds for this contention are the allegedly ineffective assistance of his counsel, the trial court’s decision to excuse two potential jurors, and the prosecution’s use of peremptory challenges to exclude potential jurors with reservations about capital punishment.
 

 A.
 
 Competence of Counsel
 

 Defendant accuses his counsel of incompetence during jury selection for (1) failing to conduct adequate voir dire and misusing peremptory challenges of prospective jurors; (2) unreasonably stipulating that potential jurors could be excused for hardship; (3) failing to rehabilitate potential jurors; (4) failing to conduct voir dire concerning a television show; (5) failing to object to prosecutorial abuse of the voir dire process; and (6) failing to request and voir dire separate guilt and penalty phase juries.
 

 1.
 
 Voir Dire and Peremptory Challenges
 

 Defense counsel exercised peremptory challenges to 21 members of the venire. As to five of the challenged prospective jurors, defendant faults counsel for passing those jurors for cause with little or no questioning. Defendant points out that thereafter the prosecutor elicited information from those jurors that led defense counsel to peremptorily challenge them. As to three of the challenged jurors, defendant asserts that their responses to questions asked in voir dire “indicated attitudes that would have made them desirable from a defense point of view, and whose peremptory dismissals are without any conceivable tactical basis.” Defendant has failed to establish ineffective assistance of counsel.
 

 The legal principles governing a claim of ineffective assistance of counsel have been set forth earlier.
 
 (Ante,
 
 at p. 158.) Briefly, to establish such a claim a defendant must show that his counsel’s performance was deficient and resulted in prejudice. If the defendant fails to show prejudice, a reviewing court may reject the claim without determining the sufficiency of counsel’s performance.
 
 (People
 
 v.
 
 Kipp, supra,
 
 18 Cal.4th at p. 366.)
 

 Defendant has failed to establish prejudice insofar as his claim is based on the possibility that further questioning during voir dire by defense counsel
 
 *165
 
 might have disclosed bias in the individuals ultimately selected as jurors. But “mere speculation that additional questioning might have disclosed a ground for challenge” is insufficient to establish ineffective representation.
 
 (People
 
 v.
 
 Kipp, supra,
 
 18 Cal.4th at p. 368.)
 

 To the extent defendant’s claim is based on the voir dire of the eight jurors who were peremptorily challenged by defense counsel, he has failed to show deficient performance. “Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process.”
 
 (People v. Montiel
 
 (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) The record here does not support defendant’s claim that counsel’s exercise of the peremptory challenges showed ineffective representation. With regard to counsel’s peremptory challenges to five of the prospective jurors, defendant does not contend his counsel lacked sufficient grounds for the challenges. With respect to defendant’s argument that three of the peremptorily challenged jurors would have been favorable to the defense, there were ample grounds for the challenges, because each expressed strong support for the death penalty in response to questions asked in voir dire.
 

 2.
 
 Excusing Potential Jurors for Hardship
 

 Defendant contends his trial counsel should have objected when the court excused some prospective jurors for hardship. Defendant has made no effort to establish that counsel’s performance was deficient when measured against the standard of a reasonably competent attorney or that counsel’s purported deficient performance prejudiced defendant. We therefore reject this claim.
 

 3.
 
 Prospective Jurors Excused for Cause
 

 A juror whose views on capital punishment would “ ‘prevent or substantially impair the performance of [the prospective juror’s] duties as a juror in accordance with the instructions and oath’ ” may be excluded for cause.
 
 (Wainwright
 
 v.
 
 Witt
 
 (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; see
 
 People
 
 v.
 
 Guzman
 
 (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917] [same standard applicable under California Constitution].) Here, the trial court excused four prospective jurors after finding that their ability to perform their duties was impaired by their opposition to the death penalty. Defendant faults trial counsel for not asking “rehabilitating” questions in an attempt to establish that these particular individuals were qualified to serve as jurors.
 

 When, as here, prospective jurors indicate they would have difficulty imposing the death penalty, but their answers are somewhat ambiguous, defense counsel may reasonably conclude from the answers given that
 
 *166
 
 the ability of each prospective juror to follow the law was substantially impaired, and that additional rehabilitative questioning would be futile. Alternatively, counsel may conclude that further questioning might provide additional indications of the prospective juror’s unwillingness to impose the death penalty, thus increasing the likelihood of getting a juror favorable to the defense excused.
 
 (People
 
 v.
 
 Memro, supra,
 
 11 Cal.4th at p. 819;
 
 People v. Tuilaepa
 
 (1992) 4 Cal.4th 569, 587 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Under these circumstances, counsel cannot be said to have rendered ineffective representation.
 
 (People
 
 v.
 
 Memro, supra,
 
 at pp. 818-819.)
 

 4.
 
 Voir Dire About Television Show
 

 On the morning of April 14, 1988, during the jury selection process, the prosecutor informed the court that a television program on the death penalty hosted by Geraldo Rivera had been broadcast the previous night. The program included interviews of death row inmates, lawyers, experts, and psychiatrists. The prosecution requested the court to ask prospective jurors whether they had seen the program and, if so, whether it had in any way affected their views on the death penalty. After telling the prospective jurors that “Geraldo Rivera had a program on death row inmates and the death penalty in California,” the court asked how many of the prospective jurors had watched the program. Of the 14 prospective jurors who responded affirmatively, two later served on the jury and a third served as an alternate juror.
 

 The trial court admonished the prospective jurors that they should only obtain information “about the criminal justice system, capital punishment and death penalty cases in this courtroom, not through the sensationalism of journalism.” The court then asked the prospective jurors to raise a hand if the program had affected their views. No hands were raised, and the .attorneys declined the court’s invitation for further questioning.
 

 On April 18, 1988, jury selection resumed. Some of the prospective jurors present that day, including three who ultimately served on the jury, had not been in court on April 14 when the court questioned the prospective jurors about the television program in question, and on April 18 the court did not mention it.
 

 Defendant faults his trial counsel for not further questioning the panel of prospective jurors on April 14 about the television program, and for not questioning the panel at all on April 18. We find no incompetence of counsel.
 

 
 *167
 
 As to April 14, the trial court determined the identity of the prospective jurors who had seen the television program, ascertained that it would not affect their ability to make a decision in this case, and admonished them that all of their information about the death penalty and this case was to be acquired in the courtroom. On both April 14 and April 18, trial counsel may well have decided as a tactical matter that it would be unwise to draw attention to the television show, and that given the panel’s earlier indication to the trial court that the program had not affected their views, no further questioning by counsel was called for.
 
 [4]
 
 With regard to counsel’s decision not to question the jury panel on April 18, we apply the rule that “ ‘unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,’ ” for counsel’s actions or omissions, we must reject a claim of ineffective representation.
 
 (People v. Kipp, supra,
 
 18 Cal.4th at p. 367.) In this case, defendant has not made the requisite showings.
 

 Defendant speculates, based on testimony at a posttrial evidentiary hearing regarding allegations of jury misconduct, that the jury may have discussed “a matter apparently discussed on the television show.” At the hearing, a juror who was present on April 14, 1988, testified: “All I recall is the TV program about someone getting ... his death penalty turned over.” The juror added, however, that she did not recall anyone saying anything about the possibility of a reversal of a sentence of life without the possibility of parole, and that if the subject was mentioned it was not discussed in depth. Defendant has not shown that the jury did discuss the television program. Nor has he shown that if such a discussion occurred, he suffered prejudice.
 

 5.
 
 Failure to Object to Prosecution’s Voir Dire
 

 Defendant contends his trial counsel was ineffective because they failed to object to voir dire questions the prosecutor asked some of the prospective jurors, including two who ultimately served as jurors. Defendant considers objectionable the prosecution’s inquiries to prospective jurors whether they would view a person’s possession of recently stolen property as circumstantial evidence that the person stole the property, whether they considered rape more of an assaultive than a sexually motivated offense, and whether they thought it was possible for a young man to rape an elderly woman and not be mentally ill.
 

 Defense counsel’s failure to object to these questions was not deficient performance, because the prosecutor’s questions were within the bounds of
 
 *168
 
 proper voir dire. At the time of defendant’s trial, permissible voir dire questions encompassed matters on which the population holds strong views that may affect deliberations, and included reasonable inquiries into specific prejudices as a basis for a challenge for cause.
 
 (People v. Noguera
 
 (1992) 4 Cal.4th 599, 645-646 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)
 
 [5]
 
 A question directed at obtaining knowledge as the basis for an exercise of a peremptory challenge, we said, was not objectionable “merely because of its additional tendency to indoctrinate or educate the jury.”
 
 (People v. Williams
 
 (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869].) Here, the prosecution’s questions concerning circumstantial evidence enabled it to learn whether prospective jurors could understand and draw inferences from such evidence; the questions regarding rape being an assaultive or a sexually motivated crime and whether a rape of an elderly victim by a young man established mental illness addressed possible specific biases prospective jurors might harbor and were matters about which members of the population could have strong views that could affect jury deliberations.
 

 Defendant accuses the prosecutor of misusing the voir dire process by erroneously telling the jury that the standard of proof of beyond a reasonable doubt applied to the penalty phase and by suggesting that jurors do not have the ultimate responsibility for the penalty decision. These assertions are presented as conclusions without adequate supporting argument, and we therefore do not consider them.
 
 (People
 
 v.
 
 Barnett
 
 (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384].)
 

 6.
 
 Defense Counsel’s Failure to Request and Voir Dire Separate Juries
 

 Defendant argues that he was entitled to separate juries at the guilt and penalty phases and that his trial counsel was incompetent for not requesting separate juries. He does not argue that the facts or circumstances of this case compelled the empanelling of separate juries. Rather, he argues generally that separate juries in death penalty cases are necessary to permit the defense to use voir dire to expose penalty phase bias on the part of prospective jurors by questioning them about uncharged crimes, without at the same time creating a bias against the defendant at the guilt phase by such questioning. We have rejected this contention in the past.
 
 (People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at p. 140.) Defendant has no right to be tried by separate juries
 
 (ibid.)
 
 or to voir dire one way for the guilt phase and another way for the penalty
 
 *169
 
 phase
 
 (People v. Rowland
 
 (1992) 4 Cal.4th 238, 267-268 [14 Cal.Rptr.2d 377, 841 P.2d 897]).
 

 B.
 
 Prosecution’s Challenges for Cause
 

 Defendant contends the trial court erred in granting the prosecution’s challenge for cause of two prospective jurors, Dolores J. and Ibrahim K.
 

 A “for cause” challenge to a prospective juror should be sustained when the juror’s views would “prevent or substantially impair” the juror’s ability to perform his or her duties in accordance with the instructions and oath.
 
 (Wainwright v. Witt, supra,
 
 469 U.S. at p. 424 [105 S.Ct. at p. 852];
 
 People
 
 v.
 
 Mincey
 
 (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) A reviewing court examines the. context in which the trial court ruled to determine if its decision is fairly supported by the record.
 
 (People v. Crittenden
 
 (1994) 9 Cal.4th 83, 122 [36 Cal.Rptr.2d 474, 885 P.2d 887].) If a prospective juror’s responses to voir dire questions are halting, equivocal, or even conflicting, “we defer to the trial court’s evaluation of a prospective juror’s state of mind, and such evaluation is binding on appellate courts.”
 
 (People v. Fudge
 
 (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].)
 

 The record here supports the trial court’s decision to excuse Prospective Juror J. for cause. When initially questioned by the court and counsel, J. said that although she generally opposed the death penalty, in an appropriate case she could vote to impose the death sentence. During a noon recess, however, J. wrote a note to the court about her previous answers, stating in part: “Although my answers favored the death penalty, to me every life should be held precious and I have changed my mind.” It became clear upon further examination that J. would not vote for the death penalty in any case. For example, when the prosecutor asked J. if she would always vote for life without possibility of parole “no matter what kind of case it was,” she answered, “that’s right.”
 

 The record also supports the trial court’s decision to excuse Prospective Juror K. for cause. K. said on voir dire that he could never impose the death penalty in a case that did not involve mass murder and that he would vote for the punishment of life without possibility of parole in every case.
 

 C.
 
 Prosecution’s Peremptory Challenges
 

 Defendant argues the prosecutor violated his constitutional rights to due process, to an impartial jury, and to a reliable determination of the
 
 *170
 
 sentence in a capital case by the systematic use of peremptory challenges to exclude prospective jurors who expressed reservations about the death penalty but were not excusable for cause.
 

 Defendant acknowledges that we rejected this argument in
 
 People v. Turner
 
 (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669], but he urges us to reconsider
 
 Turner.
 
 We have in the past rejected the contention that the United States Supreme Court’s decision in
 
 Gray v. Mississippi
 
 (1987) 481 U.S. 648 [107 S.Ct. 2045, 95 L.Ed.2d 622] requires a reexamination of this conclusion.
 
 (People v. Carrera
 
 (1989) 49 Cal.3d 291, 331-332 [261 Cal.Rptr. 348, 777 P.2d 121].) We see no reason to reconsider our holding in
 
 Turner. (People v. Champion
 
 (1995) 9 Cal.4th 879, 907 [39 Cal.Rptr.2d 547, 891 P.2d 93].)
 

 D.
 
 Alleged Jury Bias
 

 Defendant argues the jury was biased in favor of the prosecution because the trial court excluded prospective jurors with conscientious scruples against the death penalty, because the jurors were subjected to inadequate voir dire for bias, and because the jurors were biased in their evaluation of the truth of uncharged offenses at the penalty phase. We disagree. As just discussed, the trial court properly excluded certain individuals from serving as jurors. Defendant’s claim of lack of voir dire for bias and jury bias in the determination of uncharged offenses at the penalty phase is a rephrasing of his claim that he is entitled to separate guilt and penalty phase juries. We rejected that claim,
 
 ante,
 
 at pages 168-169.
 

 IV.
 
 Guilt Phase Issues
 

 A. Competence of Defense Counsel
 

 Defendant accuses his counsel of rendering incompetent representation at the guilt phase. The legal principles governing claims of ineffective assistance of counsel have been set forth above.
 
 (Ante,
 
 at p. 158.) Briefly, to establish such a claim a defendant must show that trial counsel’s performance was deficient and resulted in prejudice. If a defendant fails to show prejudice, a reviewing court may reject the claim without determining the adequacy of counsel’s performance.
 
 (People v. Kipp, supra,
 
 18 Cal.4th at p. 366.)
 

 1.
 
 Failure to Object to Photographs of Murder Victim
 

 Defendant faults trial counsel for not objecting to the admission into evidence of photographs of victim Mary Frances Litovich’s charred
 
 *171
 
 body and of her when she was alive. Defendant argues the photographs were irrelevant to any issue in the case.
 

 Established rules of evidence govern the admissibility of photographs.
 
 (People v. Crittenden, supra, 9
 
 Cal.4th at p. 132.) Only relevant evidence is admissible. (Evid. Code, § 351.) Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact that is of consequence to the action, including the credibility of witnesses.
 
 (Id.,
 
 § 210.)
 

 The photograph of Litovich’s body was relevant because it corroborated and clarified not only arson investigator Jakubowski’s testimony as to where and how the fire started and spread, but also the coroner’s testimony regarding the cause of death and condition of the body.
 
 (People v. Scheid
 
 (1997) 16 Cal.4th 1, 18 [65 Cal.Rptr.2d 348, 939 P.2d 748];
 
 People
 
 v.
 
 Crittenden, supra, 9
 
 Cal.4th at p. 132;
 
 People v. Pride
 
 (1992) 3 Cal.4th 195, 243 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The photograph was also relevant to the prosecution’s proof of the charges of forcible rape, residential robbery, and arson with great bodily injury. Contrary to defendant’s assertion, photographs of a murder victim may be relevant in murder cases tried on any theory, including the theory of felony murder.
 
 (People
 
 v.
 
 Scheid, supra,
 
 16 Cal.4th at pp. 17-18.)
 

 The photograph of Litovich when she was alive was relevant to Officer Hinds’s identification of her as the person to whom he spoke shortly before discovery of the fire, thereby assisting the prosecution in establishing the chronological order of events. (See
 
 People v. DeSantis
 
 (1992) 2 Cal.4th 1198, 1230 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)
 

 We reject defendant’s argument that trial counsel could have prevented the admission into evidence of the photographs by stipulating to the truth of matters to which they were relevant. (See
 
 People v. Pride, supra,
 
 3 Cal.4th at p. 243.) We also reject defendant’s assertion that trial counsel was incompetent in not objecting, on the ground of lack of foundation, to the admission of the photograph of the victim when she was alive. For the reasons given above, such an objection would not have been well taken and would therefore have been futile.
 

 Finally, an objection by the defense counsel to the introduction into evidence of the photograph of Litovich’s body on the ground that it was more prejudicial than probative would not have succeeded. (Evid. Code, § 352.) We have independently reviewed the photographs, and we conclude that they are not unduly gruesome or inflammatory.
 
 (People v. Scheid, supra,
 
 16 Cal.4th at p. 19;
 
 People v. Pride, supra,
 
 3 Cal.4th at p. 243.)
 

 
 *172
 
 2.
 
 Defense Counsel’s Failure to Object to Prosecutor’s Argument
 

 Defendant complains about his counsel’s failure to object to allegedly improper statements in the prosecutor’s guilt phase closing argument to the jury. We reject defendant’s claim.
 

 A prosecutor’s argument may properly be based on evidence, including reasonable inferences or deductions drawn from the evidence, and on matters that are common knowledge.
 
 (People v. Williams
 
 (1997) 16 Cal.4th 153, 221 [66 Cal.Rptr.2d 123, 940 P.2d 710].) A defense attorney’s failure to object at trial rarely establishes ineffectiveness. (Ibid.;
 
 People v. Kelly
 
 (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385].)
 

 Here, defendant faults trial counsel for not objecting on the ground that in closing argument the prosecutor improperly “testified” to facts not in evidence. Defendant initially cites the prosecutor’s comment to the jury that robbery victim Jung Wang had described defendant’s hair as “combed back like Cholo style, gang style.” As defendant notes, Wang never testified that defendant wore his hair “gang style,” only that he wore it “Cholo style.” The prosecutor’s “gang style” remark, however, was fleeting and was made in the context of noting the identification of defendant by several witnesses.
 

 Nor can trial counsel be faulted for not objecting to the prosecutor’s comments that defendant was not intoxicated on the day of the murder, as shown by his ability to concoct a lie, and that defendant could not have found Litovich’s jewelry or received it from someone else because “[w]e know the defendant is a loner.” These comments by the prosecutor were within the scope of the evidence presented. Equally without merit is defendant’s assertion that his counsel should have objected when the prosecutor used the word “we” in her remark, “[w]e know the defendant is a loner.” The word “we” obviously included the jury, and the comment referred to the evidence presented to the jury.
 

 Defendant also contends his trial counsel should have objected to what defendant describes as prosecutorial misrepresentations of the law. He accuses the prosecutor of improperly arguing to the jury that defendant failed to present expert testimony showing that defendant “could not have formed” the requisite specific intent to commit the felonies involved in his case. Defendant argues that because the defense of diminished capacity was abolished before his trial, evidence that he could not have formed the requisite intent was inadmissible and the prosecutor therefore misrepresented the law to the jury. The prosecutor, however, made the statement in question while discussing the instruction about intoxication as negating specific
 
 *173
 
 intent. Evidence of intoxication is admissible to show that a defendant lacked the requisite specific intent. (§ 22, subd. (b).) In context, the prosecutor’s comment referred to the possible effect of intoxication on defendant’s actual formation of the requisite specific intent, not on his capacity to form such intent.
 

 We also reject defendant’s contention that his counsel was incompetent for not objecting to the prosecutor’s argument on the definition of reasonable doubt. After describing reasonable doubt as “like being in love,” the prosecutor told the jury: “You can’t really describe it but you know it when you see it. It’s that feeling that you have, that you feel comfortable with and it’s not something mystical, magical at all.” The trial court gave the jury the standard instruction on reasonable doubt. (CALJIC No. 2.90 (1979 rev.).) We have previously held that the “court’s instructions, not the prosecution’s argument, are determinative, for ‘[w]e presume that jurors treat the court’s instructions as a statement of the law by a judge, and the prosecutor’s comments as words spoken by an advocate in an attempt to persuade.’ ”
 
 (People
 
 v.
 
 Mayfield
 
 (1993) 5 Cal.4th 142, 179 [19 Cal.Rptr.2d 836, 852 P.2d 331], quoting
 
 People v. Clair
 
 (1992) 2 Cal.4th 629, 663, fn. 8 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Defendant here has failed to demonstrate that counsel’s failure to object was prejudicial. (See
 
 People v. Kipp, supra,
 
 18 Cal.4th at p. 366.)
 

 Defendant asserts trial counsel should have objected to the prosecutor’s description of Ann DiPrima’s testimony on the ground it misstated the evidence. The prosecutor mentioned to the jury DiPrima’s testimony that defendant had brought to her house cartons of cigarettes, firecrackers, speakers with Chinese lettering on them, and a coffee can with coins in it, telling her that he had obtained them from Chinatown. Defendant correctly notes DiPrima did not testify that defendant told her the speakers or the can of coins were from Chinatown. DiPrima, however, did testify that when she saw defendant the morning after the commercial burglaries he had a coffee can with change in it and that several days later she discovered speakers with Chinese lettering on them in her backyard. Defendant fails to show that trial counsel’s failure to object to the prosecutor’s slight mlscharacterization of DiPrima’s testimony was prejudicial.
 

 3.
 
 Defense Counsel’s Failure to Request Instructions on Lesser Included Offenses
 

 Defendant contends trial counsel should have requested jury instructions on lesser offenses necessarily included in the crimes of robbery, rape, and arson, the offenses on which his felony-murder conviction and the special circumstance findings were based.
 

 
 *174
 
 An instruction on a lesser included offense must be given only when the evidence warrants such an instruction.
 
 (People v. Avena
 
 (1996) 13 Cal.4th 394, 424 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) To warrant such an instruction, there must be substantial evidence of the lesser included offense, that is, “evidence from which a rational trier of fact could find beyond a reasonable doubt” that the defendant committed the lesser offense.
 
 (People v. Berryman
 
 (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Speculation is insufficient to require the giving of an instruction on a lesser included offense.
 
 (Ibid.; People
 
 v.
 
 Wilson
 
 (1992) 3 Cal.4th 926, 941 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) In addition, a lesser included instruction need not be given when there is no evidence that the offense is less than that charged.
 
 (People v. Barton
 
 (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d 531].)
 

 Defendant argues counsel should have requested an instruction on theft as a lesser included offense of robbery. He asserts the jury could have concluded that the “force or fear” element of robbery was not proven because the jury might have found that defendant did not form the intent to steal until after his attack on victim Litovich. Defendant’s argument is based on speculation, not evidence, and we therefore reject it.
 
 (People
 
 v.
 
 Wilson, supra,
 
 3 Cal.4th at pp. 941-942;
 
 People
 
 v.
 
 Lewis
 
 (1990) 50 Cal.3d 262, 276-277 [266 Cal.Rptr. 834, 786 P.2d 892].)
 

 Defendant faults counsel for not asking the trial court to instruct on assault, battery, and assault by force likely to cause great bodily injury as lesser offenses included in the crime of rape. He argues that the jury might have concluded there was someone else in Litovich’s house who raped her after defendant assaulted her. Defendant relies on the absence of evidence matching the semen found in the victim to him, the absence of his fingerprints at the scene, the lack of any physical evidence from the victim (such as her hair or blood) on defendant’s body at the time of his arrest, and the short period of time in which the crimes were committed. Even if we were to assume that the crimes of assault, battery, and assault by force likely to cause great bodily injury are necessarily included in the offense of rape and that the evidence was sufficient to permit a jury to conclude there was more than one perpetrator inside Litovich’s home, we cannot accept defendant’s argument. There is no evidence that the assault on Litovich and the rape of Litovich were committed by different people. Defendant’s argument to the contrary is pure speculation. In addition, there is no evidence that the offense committed was less than the rape charged.
 

 Finally, defendant contends counsel should have requested an instruction on unlawfully setting fire to an inhabited structure (§ 452) as a lesser
 
 *175
 
 included offense of arson. He argues the record is “more consistent with a conclusion that the Litovich home burned as a result of reckless conduct in setting fire to the victim’s bed, than a conclusion that there was an intentional burning of the house itself.” Defendant relies on evidence that the fire was started at the foot of the bed to which the victim was tied and it spread from there. Assuming for the sake of argument that unlawfully setting fire to an inhabited structure is a lesser included offense of arson, the evidence here was insufficient to require the trial court to instruct on that offense. The evidence of the cause and nature of the fire, as presented by arson investigator Anthony Jakubowski, established that the flammable liquid used to start the fire was poured on the bed and “distributed throughout the room.” The evidence here is not substantial enough to merit consideration by the jury of the possibility that defendant recklessly set fire to a bed on which he had tied the victim without intending also to bum the house. (See
 
 People
 
 v.
 
 Barton, supra,
 
 12 Cal.4th at p. 195, fn. 4.)
 

 For the reasons given, we conclude that defense counsel was not incompetent for failing to request instructions on theft, assault, battery, assault with intent to inflict great bodily injury, and unlawfully causing a fire to an inhabited structure.
 

 B.
 
 Burglary Convictions
 

 1.
 
 Motion for Judgment of Acquittal
 

 At the close of the prosecution’s guilt phase case, the trial court denied defendant’s motion for acquittal on the ground of insufficient evidence of the charges of burglary of the Chung Hing News and of the Ying On Association in the Chinatown section of Los Angeles. (§ 1118.1.) Defendant contends the denial was error.
 

 A trial court should deny a motion for acquittal under section 1118.1 when there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.
 
 (People
 
 v.
 
 Mincey, supra,
 
 2 Cal.4th at p. 432, fn. 2;
 
 People
 
 v.
 
 Ainsworth
 
 (1988) 45 Cal.3d 984, 1022 [248 Cal.Rptr. 568, 755 P.2d 1017].) In support of his claim of trial court error, defendant relies on the mle that evidence of possession of property taken in a burglary, unless augmented by other evidence corroborating the defendant’s involvement, is insufficient to support a burglary conviction (e.g.,
 
 People
 
 v.
 
 McFarland
 
 (1962) 58 Cal.2d 748, 759 [26 Cal.Rptr. 473, 376 P.2d 449];
 
 People
 
 v.
 
 Citrino
 
 (1956) 46 Cal.2d 284, 288 [294 P.2d 32]), contending the only evidence pointing to his commission of the two burglaries was testimony that he was found in possession of property stolen in the burglaries.
 

 
 *176
 
 When, as here, a defendant is found in possession of property stolen in a burglary shortly after the burglary occurred, the corroborating evidence of the defendant’s acts, conduct, or declarations tending to show his guilt need only be slight to sustain the burglary convictions.
 
 (People v. McFarland, supra,
 
 58 Cal.2d at p. 754;
 
 People v. Anderson
 
 (1989) 210 Cal.App.3d 414, 421 [258 Cal.Rptr. 482].) Here, there is adequate corroborating evidence. The burglaries were committed after 2:00 a.m. on February 7, 1986. Later that same morning, both Patricia Saldivar and Ann DiPrima saw defendant with property taken in the burglaries. In addition, defendant told DiPrima he had “been to Chinatown” when asked where he had obtained some of the stolen property. Based on this evidence, the trial court correctly denied defendant’s motion for acquittal.
 

 2.
 
 Jury Instruction on Conscious Possession of Stolen Property
 

 Defendant contends the trial court improperly instructed the jury on his possession of property taken in the burglaries and that the error requires reversal of the burglary convictions as a violation of state law. The error, if any, was harmless.
 

 The trial court gave the jury the 1984 revision of CALJIC No. 2.15, the standard instruction on possession of stolen property. The first paragraph of the instruction explained to the jury that conscious possession of recently stolen property was not by itself sufficient to permit an inference that defendant was guilty of robbery, burglary, or kidnapping to commit robbery. It stated that corroborating evidence of guilt was necessary, but that the corroboration need only be slight and did not by itself have to be sufficient to warrant an inference of guilt.
 

 The second paragraph of CALJIC No. 2.15 (1984 rev.) listed the types of corroborating evidence the jury “may consider”: (1) “the attributes of possession—time, place and manner”; (2) “that the defendant had the opportunity to commit the crime charged”; (3) “the defendant’s conduct”; (4) “his false or contradictory statements, if any”; (5) “other statements he may have made with reference to the property”; (6) “a false account of how he acquired possession of the stolen property”; and (7) “any other evidence which tends to connect the defendant with the crime charged.”
 

 Defendant concedes he made statements with reference to the property, as listed in category (5), but he asserts there was no evidence on the other categories and therefore they should not have been mentioned in the instruction.
 

 Even if we assume error, defendant suffered no prejudice. The instruction in general was favorable to defendant. It told the jury that possession of
 
 *177
 
 stolen property alone was
 
 insufficient
 
 to permit an inference that defendant was guilty of burglary.
 
 (People
 
 v.
 
 Johnson
 
 (1993) 6 Cal.4th 1, 37 [23 Cal.Rptr.2d 593, 859 P.2d 673].) The second paragraph of the instruction said that the jury
 
 “may
 
 consider” the categories listed, and thus did not require the jury to take them into account. Also, the trial court instructed the jury on the definition of burglary. (CALJIC No. 14.50 (1981 rev.).) Moreover, the court told the jury to “disregard any instruction which applies to a state of facts which you determine does not exist.” (CALJIC No. 17.31.) As we have explained, here there was sufficient corroborating evidence of defendant’s commission of burglary. (See
 
 People
 
 v.
 
 Holt
 
 (1997) 15 Cal.4th 619, 676-677 [63 Cal.Rptr.2d 782, 937 P.2d 213].) It is not reasonably probable a result more favorable to the defendant would have been reached in the absence of the error, if any.
 
 (People
 
 v.
 
 Watson
 
 (1956) 46 Cal.2d 818, 836 [299 P.2d 243];
 
 People
 
 v.
 
 Peters
 
 (1982) 128 Cal.App.3d 75, 86 [180 Cal.Rptr. 76].)
 

 C.
 
 Admission of Evidence
 

 On May 9, 1988, the prosecution called as a witness Dr. Lakshmanan Sathyavagiswaran, the Chief of Forensic Medicine for the Los Angeles County Medical Examiner’s office. Doctor Sathyavagiswaran briefly described his professional experience, which included the performance of over 2,500 autopsies and the supervision of numerous autopsies. Later that day, the prosecution recalled Dr. Sathyavagiswaran to testify that wounds shown on a photograph of defendant’s neck taken the day after his arrest were scratch marks made within 24 hours of the photograph being taken. The defense objected to this testimony as lacking any evidentiary foundation, lacking pretrial discovery, and being unduly prejudicial. Defendant contends the trial court erred in overruling the objection. Not so.
 

 A witness is qualified to testify as an expert if the witness has special knowledge, skill, experience, or education pertaining to the matter on which the testimony is offered. (Evid. Code, § 720.) In reviewing a trial court’s ruling allowing expert testimony, we ask whether the ruling was an abuse of discretion.
 
 (People
 
 v.
 
 Mayfield
 
 (1997) 14 Cal.4th 668, 766 [60 Cal.Rptr.2d 1, 928 P.2d 485];
 
 People
 
 v.
 
 Chavez
 
 (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].) Here, Dr. Sathyavagiswaran testified he was a licensed physician and the Chief of Forensic Medicine for the Los Angeles County Medical Examiner’s office, and that he had performed over 2,500 autopsies. Given this evidence, the record amply supports the trial court’s ruling that Dr. Sathyavagiswaran was qualified to testify to the nature of the wounds shown in the photograph of defendant.
 

 Contrary to defendant’s assertion, Dr. Sathyavagiswaran’s testimony did not violate defendant’s discovery rights. The scratches on defendant’s neck
 
 *178
 
 were noted at the preliminary hearing on the murder charge, and the prosecution’s pretrial disclosure of information to the defense included five photographs of the injuries to defendant’s neck and arms taken the day after his arrest. Likewise unpersuasive is defendant’s claim that the trial court should have excluded the testimony because it was given months after the wounds had healed. The defense as well as the prosecution had adequate evidence of defendant’s wounds before trial.
 

 Also meritless is defendant’s argument that there is no affirmative showing in the record that the trial court weighed the prejudicial effect of admitting the testimony against its probative effect. (Evid. Code § 352.) A trial court “ ‘need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so . . . .’”
 
 (People v. Waidla
 
 (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) Here, the record as a whole shows that the court performed its obligations. (See
 
 People
 
 v.
 
 Riel
 
 (2000) 22 Cal.4th 1153, 1187-1188 [96 Cal.Rptr.2d 1, 998 P.2d 969].)
 

 We further reject defendant’s contention that the trial court erred by admitting the testimony of kidnapping and robbery victim Piedad Saiz that she understood the word “homeboy” to refer to a gang. As noted,
 
 ante,
 
 at page 163, the prosecutor asked Saiz what defendant said when he was hanging onto her car door in the course of the offenses. Saiz responded that defendant had said he was a “homeboy.” When the prosecutor asked Saiz what the term “homeboy” meant to her, the defense objected to the question as being immaterial. The trial court overruled the objection after the prosecutor responded that the question “goes to her state of mind as to whether or not there was fear induced.” Saiz then testified that she understood the term “homeboy” to mean “a gang.”
 

 Defendant was charged with robbing Saiz. The elements of robbery include the taking of personal property from a victim by means of force or fear. (§ 211.) The prosecution’s questions and Saiz’s answers were directly relevant to establishing the element of fear. Thus, contrary to defendant’s assertion, this case is readily distinguishable from
 
 Dawson
 
 v.
 
 Delaware
 
 (1992) 503 U.S. 159 [112 S.Ct. 1093, 117 L.Ed.2d 309], where the high court held that it was improper to introduce at the sentencing phase of a capital case irrelevant evidence of a defendant’s abstract beliefs.
 
 (Id.
 
 at pp. 165-167 [112 S.Ct. at
 
 pp.
 
 1097-1099].)
 

 Equally without merit is defendant’s claim that Saiz was not competent to testify about the meaning of the word “homeboy.” Saiz testified simply to
 
 her understanding of
 
 the meaning of the term. In any event, defendant offers no sound basis to support his claim that the meaning of the term “homeboy” may only be presented through expert testimony.
 

 
 *179
 
 We reject defendant’s contention that the probative value of Saiz’s testimony was outweighed by its prejudicial effect or that it violated his right to due process by rendering the trial unfair. As noted above, the probative value of Saiz’s testimony was high—it was evidence directly relevant to an element of an offense charged, here robbery. A defendant is not prejudiced or treated unfairly simply because the prosecution introduces evidence of the defendant’s guilt. (Evid. Code, § 352;
 
 People v. Cudjo
 
 (1993) 6 Cal.4th 585, 610 [25 Cal.Rptr.2d 390, 863 P.2d 635].) For the same reason, we reject defendant’s claim that the prosecutor’s questions constituted misconduct.
 

 D.
 
 Jury Instructions
 

 Defendant contends the trial court erred by giving the jury standard instructions on (1) flight after a crime (CALJIC No. 2.52 (1979 rev.)); (2) sufficiency of circumstantial evidence (CALJIC No. 2.01 (1979 rev.)); and (3) sufficiency of circumstantial evidence to prove specific intent (CALJIC No. 2.02 (1980 rev.)). In addition, defendant claims the trial court erred by not modifying on its own initiative the standard jury instruction on the factors to be considered in proving identity by eyewitness testimony. (CALJIC No. 2.92 (1984).) We reject each of defendant’s contentions, as discussed below.
 

 1.
 
 Flight Instruction
 

 Section 1127c requires an instruction to the jury when there is evidence of flight. The trial court here gave the standard instruction, CALJIC No. 2.52 (1979 rev.), which reads: “The flight of a person immediately after the commission of a crime, or after he is accused of the crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.”
 

 Defendant contends the flight instruction violated his right to due process. He argues the instruction creates an unconstitutional permissive inference because it cannot be said with “ ‘substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.’ ”
 
 (Ulster County Court
 
 v.
 
 Allen
 
 (1979) 442 U.S. 140, 166, fn. 28 [99 S.Ct. 2213, 2229, 60 L.Ed.2d 777], quoting
 
 Leary v. United States
 
 (1969) 395 U.S. 6, 36 [89 S.Ct. 1532, 1548, 23 L.Ed.2d 57];
 
 U.S.
 
 v.
 
 Rubio-Villareal
 
 (9th Cir. 1992) 967 F.2d 294, 296, quoting
 
 Leary
 
 v.
 
 United States, supra,
 
 395 U.S. at p. 36 [89 S.Ct. at p. 1548].) We have rejected closely related contentions
 
 (People v. Smithey
 
 (1999) 20 Cal.4th 936, 983 [86 Cal.Rptr.2d 243, 978 P.2d 1171]), and we reject defendant’s contention here.
 

 
 *180
 
 The due process clauses of the federal Constitution (U.S. Const., 5th & 14th Amends.) require a relationship between the permissively inferred fact and the proven fact on which it depends. The standard for evaluating the relationship has been variously described as “rational connection,” “more likely than not,” and “reasonable doubt.”
 
 (Barnes
 
 v.
 
 United States
 
 (1973) 412 U.S. 837, 841-843 [93 S.Ct. 2357, 2360-2361, 37 L.Ed.2d 380].) These seemingly disparate statements of the due process standard differ in language, not substance. Although these “standards bear ambiguous relationships to one another, the ambiguity is traceable in large part to variations in language and focus rather than to differences of substance.”
 
 (Id.
 
 at p. 843 [9 S.Ct. at p. 2361].)
 

 As the United States Supreme Court has observed: “A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. Such inferences do not necessarily implicate the concerns of
 
 Sandstrom
 
 [v.
 
 Montana
 
 (1979) 442 U.S. 510 [99 S.Ct. 2450, 61 L.Ed.2d 39]]. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.
 
 Ulster County Court
 
 [v.
 
 Allen], supra,
 
 442 U.S., at 157-163 [99 S.Ct. at pp. 2224-2227].”
 
 (Francis v. Franklin
 
 (1985) 471 U.S. 307, 314-315 [105 S.Ct. 1965, 1971, 85 L.Ed.2d 344]; accord,
 
 Barnes v. United States, supra,
 
 412 U.S. at p. 845 [93 S.Ct. at pp. 2362-2363];
 
 U.S. v. Beltran-Garcia
 
 (9th Cir. 1999) 179 F.3d 1200; see
 
 Illinois
 
 v.
 
 Wardlow
 
 (2000) 528 U.S. 119, 124-126 [120 S.Ct. 673, 676-677, 145 L.Ed.2d 570].) This test permits a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt. Thus, here the flight instruction does not violate due process.
 

 Defendant’s remaining challenges to the flight instruction merit only brief mention. We disagree with defendant’s claim that it was “impossible” for the jury to draw a reasonable inference as to consciousness of guilt regarding any of the specific crimes charged. (See
 
 People v. Bolin
 
 (1998) 18 Cal.4th 297, 327 [75 Cal.Rptr.2d 412, 956 P.2d 374].) It is for the jury to determine to which offenses, if any, the inference should apply. For example, the jury here could reasonably conclude that defendant’s flight immediately after the arson and the attack on Mary Litovich evidenced consciousness of guilt of those and related offenses. We also reject defendant’s argument that the flight instruction is an improper pinpoint instruction. The instruction informs the jury that it may consider flight in connection with all other proven facts, giving the fact of flight the weight the jury deems appropriate.
 
 (People
 
 v.
 
 Kelly, supra,
 
 1 Cal.4th at p. 531.) The instruction is not argumentative; it
 
 *181
 
 does not impermissibly direct the jury to make only one inference. Finally, defendant contends the instruction unconstitutionally lessens the prosecution’s burden of proof. It does not.
 
 (Francis v. Franklin, supra,
 
 471 U.S. at p. 314 [105 S.Ct. at p. 1971].)
 

 2.
 
 Instructions on Circumstantial Evidence
 

 The trial court gave the jury the standard instructions on sufficiency of circumstantial evidence (CALJIC No. 2.01 (1979 rev.)) and on sufficiency of circumstantial evidence to prove specific intent (CALJIC No. 2.02 (1980 rev.)). Both instructions tell the jurors that if one interpretation of the circumstantial evidence “appears to you to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable.” (CALJIC Nos. 2.01, 2.02.)
 

 Defendant contends these instructions impermissibly shift the burden of proof to the defense because they allow the jury to find a defendant guilty even when the defense has established a reasonable doubt as to guilt. We have repeatedly rejected similar contentions in the past. (E.g.,
 
 People v. Crittenden, supra,
 
 9 Cal.4th at p. 144;
 
 People
 
 v.
 
 Wilson, supra,
 
 3 Cal.4th at pp. 942-943.) We do so again here. We also reject defendant’s recasting of this argument, namely, that the instructions impermissibly permit the jury to draw an inference without requiring the jury to determine that the inference (the interpretation of the circumstantial evidence) is both reasonable and “more likely than not.”
 

 3.
 
 Instruction on Eyewitness Testimony
 

 The trial court gave the jury the standard instruction on the burden of proving identity based solely on eyewitness testimony. (CALJIC No. 2.91 (1982 rev.).) The instruction says that, in determining the weight to be given eyewitness testimony identifying the defendant, the jury should consider a number of factors bearing on the accuracy of the identification, “including, but not limited to” such matters as the witness’s opportunity to observe, the stress to which the witness was subjected, and the cross-racial or ethnic nature of the identification.
 
 (Ibid.)
 

 Defendant contends the trial court should on its own motion have added to the eyewitness identification instruction that the jury should consider “the effects on recall of bias or improper cues in police identification procedures.” We disagree. Nothing in CALJIC No. 2.91, the instruction given, prevents the parties from arguing any factors the jury should consider if
 
 *182
 
 supported by the evidence. Indeed, a number of instructions in addition to CALJIC No. 2.91 afforded defendant ample opportunity to challenge the validity of witness credibility and testimony. For instance, the jury here was given the standard instructions on witness credibility (CALJIC No. 2.20), discrepancies in testimony (CALJIC No. 2.21), weighing conflicting testimony (CALJIC No. 2.22), sufficiency of testimony of one witness (CALJIC No. 2.27), and reasonable doubt (CALJIC No. 2.90). The trial court did not err in failing to add to CALJIC No. 2.91 any language that the jury should consider the effects of recall or improper cues in police identification.
 
 (People
 
 v.
 
 Alcala
 
 (1992) 4 Cal.4th 742, 803 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Because the instructions given were adequate and the parties were free to argue to the jury the factors it could consider in evaluating eyewitness identification testimony, defense counsel did not render ineffective representation in not requesting the instruction in question.
 

 V.
 
 Special Circumstance Issues
 

 A.
 
 Insufficiency of Evidence of Arson-murder Special Circumstance
 

 A felony-murder special circumstance, such as arson murder, may be alleged when the murder occurs during the commission of the felony, not when the felony occurs during the commission of a murder.
 
 (People
 
 v.
 
 Marshall, supra,
 
 15 Cal.4th at p. 41;
 
 People v. Green
 
 (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468].) Thus, to prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.
 
 (People v. Clark
 
 (1990) 50 Cal.3d 583, 608 [268 Cal.Rptr. 399, 789 P.2d 127].)
 

 By finding the special circumstance allegations true, the jury here necessarily determined that defendant intentionally killed Mary Frances Litovich while committing arson. The murder of Litovich occurred after our decision in
 
 Carlos
 
 v.
 
 Superior Court
 
 (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], and before our decision in
 
 People v. Anderson, supra,
 
 43 Cal.3d 1104. For murders committed during this period, intent to kill is an element of a felony-murder special circumstance whether or not the defendant was the actual killer.
 
 (People v. Marshall, supra,
 
 15 Cal.4th at pp. 41-42.) Here, the jury was instructed that to find the special circumstance allegations true, it had to find that defendant intended to kill a human being.
 

 Defendant contends the evidence is insufficient to support the jury’s true finding of the arson-murder special-circumstance allegation. He argues that
 
 *183
 
 because fire caused Litovich’s death, and because the jury determined that he intentionally killed Litovich, it necessarily follows that he set the fire for the purpose of killing Litovich and thus did not have the independent felonious intent required for the arson-murder special circumstance under
 
 People
 
 v.
 
 Green, supra,
 
 27 Cal.3d 1, and for the felony-murder rule under
 
 People v. Ireland
 
 (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]. The Attorney General argues that
 
 Green
 
 is inapplicable because defendant set the fire with concurrent intent to kill Litovich and to destroy evidence of other crimes.
 

 In
 
 People
 
 v.
 
 Raley
 
 (1992) 2 Cal.4th 870 [8 Cal.Rptr.2d 678, 830 P.2d 712], we addressed these same arguments in the context of a murder committed during a kidnapping. The defendant there argued that
 
 People v. Green, supra,
 
 27 Cal.3d 1, precluded a kidnap-murder special circumstance because he had kidnapped his victims for the purpose of killing them. We reviewed the evidence to determine whether the defendant had a “purpose for the kidnapping apart from murder”
 
 (People
 
 v.
 
 Raley, supra,
 
 at p. 902), concluding that the evidence was sufficient to support such a finding by the jury
 
 (id.
 
 at pp. 902-903). We rejected the defendant’s argument in
 
 Raley
 
 that if the jury found intent to kill at the time of the kidnapping, there could be no kidnap-murder special circumstance: “Concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.
 
 (People
 
 v.
 
 Clark, supra,
 
 50 Cal.3d at pp. 608-609.) It is when the underlying felony is merely incidental to a murder that we apply the rule of
 
 Green, supra,
 
 27 Cal.3d 1.”
 
 (People
 
 v.
 
 Raley, supra,
 
 at p. 903.)
 

 We must therefore determine here whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded that defendant had a purpose for the arson apart from the murder.
 
 (People v. Marshall, supra,
 
 15 Cal.4th at p. 34;
 
 People v. Raley, supra,
 
 2 Cal.4th at p. 902.) We conclude the evidence is sufficient to establish that defendant started the fire with “independent, albeit concurrent, goals.”
 
 (People
 
 v.
 
 Clark, supra,
 
 50 Cal.3d at p. 609.)
 

 The testimony of arson investigator Anthony Jakubowski supports the conclusion that defendant committed the arson not just to kill the victim, but also as a means of concealing the rape or avoiding detection. Jakubowski testified the fire was started when a water-soluble flammable liquid was poured over the bed and distributed throughout the room and then ignited with an open flame. This testimony supports the conclusion that defendant harbored independent, albeit concurrent, goals. He intended not only to kill the victim, but also to destroy evidence of the rape (such as the victim’s torn clothing or bruises on her body) as well as evidence of his presence (such as
 
 *184
 
 fingerprints). For the same reason, we reject defendant’s argument that the rule of
 
 People
 
 v.
 
 Ireland, supra,
 
 70 Cal.2d 522, applies here.
 
 (People
 
 v.
 
 Clark, supra,
 
 50 Cal.3d at p. 609, fn. 15.)
 

 B.
 
 Instructions on Lesser Included Offense
 

 Defendant contends the trial court committed reversible error when it did not, on its own motion, instruct the jury on (1) theft as a lesser offense necessarily included in the offense of robbery, (2) assault and battery as lesser included offenses of rape, and (3) unlawfully causing a fire to an inhabited structure as a lesser included offense of arson. He argues that because the special circumstance allegations against him found true by the jury were for robbery murder, rape murder, and arson murder, the alleged error requires the special circumstance findings to be set aside and the judgment of death reversed.
 

 A trial court must instruct the jury on a lesser included offense only when there is evidence that would justify a conviction of the lesser offense.
 
 (People v. Avena, supra,
 
 13 Cal.4th at p. 424;
 
 People v. Wilson, supra,
 
 3 Cal.4th at pp. 941-942.) Earlier, at pages 173-175, when we discussed defendant’s claim of ineffective assistance of counsel, we rejected his contention that he was entitled to instructions on the lesser included offenses just mentioned, concluding that the evidence did not warrant such instructions. We reiterate that conclusion here.
 

 VI.
 
 Penalty Phase Issues
 

 Defendant claims that numerous penalty phase errors require reversal of the judgment of death. The alleged errors pertain to the adequacy of defense counsel’s representation, certain jury instructions, and the trial court’s failure to correct a statement by the prosecutor in closing argument. None of these claims have merit, as discussed below.
 

 A.
 
 Adequacy of Representation
 

 On page 158,
 
 ante,
 
 we set forth the rules governing a defendant’s claim of ineffective assistance of counsel. To summarize, the defendant must show both that counsel failed to act as a reasonably competent attorney and that counsel’s failure prejudiced the defendant by so undermining the trial process that the trial cannot be relied on as having produced a just result.
 

 1.
 
 Defense Counsel’s Failure to Object to Testimony and Introduction of Aggravating Evidence Without Notice
 

 Ann DiPrima, defendant’s girlfriend, testified at the penalty phase that defendant physically assaulted her on January 8, 1986. When the
 
 *185
 
 prosecutor asked DiPrima if she had spoken to defendant “sometime after that occasion” about the police chasing him, she replied that defendant had told her the police had chased him, that he had caused a traffic accident when he “crashed the car,” and that he had run away from the scene of the accident and the police. Defendant asserts his counsel should have objected to this question as irrelevant, as inadmissible hearsay, and as evidence of an aggravating factor as to which the prosecution had failed to give the notice required by section 190.3.
 

 The prosecution’s question was proper and DiPrima’s answer was admissible. Evidence of prior criminal activity involving the use or attempted use of force is admissible at the penalty phase of a capital trial. (§ 190.3, factor (b);
 
 People
 
 v.
 
 Visciotti
 
 (1992) 2 Cal.4th 1, 68 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Such evidence encompasses all crimes committed during a continuous course of criminal activity.
 
 (People v. Cooper
 
 (1991) 53 Cal.3d 771, 840-841 [281 Cal.Rptr. 90, 809 P.2d 865].) Thus, here the evidence of defendant’s flight from the police after the assault was relevant as aggravating evidence under section 190.3. The prosecution established that the police chase occurred after defendant’s assault on DiPrima as part of a continuing course of criminal activity. A hearsay objection by defense counsel would have been unsuccessful because defendant’s out-of-court statement to DiPrima was admissible as a party admission. (Evid. Code, § 1220.)
 

 Also without merit is defendant’s claim that the prosecution violated section 190.3 by not giving the defense notice of its intent to introduce evidence of the police chase and car accident. A notice of intent to introduce evidence of a specific prior crime includes evidence of all crimes committed as part of the same course of conduct.
 
 (People v. Visciotti, supra,
 
 2 Cal.4th at p. 70.) Here, the prosecution’s “Notice of Intention to Introduce Evidence in Aggravation” included the incident on “January 8, 1986, in which defendant assaulted Ann DiPrima.”
 

 2.
 
 Defense Counsel’s Failure to Object to Victim’s Showing of Scars
 

 Francisco Lopez testified that while he was walking home on the night of February 1, 1986, defendant approached him and demanded money. When Lopez did not immediately reply, defendant placed a gun against Lopez’s chest and shot him. At the prosecutor’s request and without objection, Lopez showed the jury scars on his chest that resulted from the shooting.
 

 Defendant contends trial counsel should have objected that the scars were not relevant and that the victim’s display of the scars was inflammatory and
 
 *186
 
 highly prejudicial. The impact of a capital defendant’s past crimes on the victims of those crimes is relevant to the penalty decision, however.
 
 (People
 
 v.
 
 Clark, supra,
 
 50 Cal.3d at p. 629.) Defendant cannot now challenge counsel’s failure to object. Such a claim must be rejected on appeal when the record does not show why counsel acted or failed to act in the manner challenged “ ' “unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation” ....’”
 
 (People
 
 v.
 
 Mendoza Tello
 
 (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) Defendant has not shown that counsel was asked for and failed to provide an explanation for not objecting to this evidence or that there could be no satisfactory explanation for counsel’s decision not to object.
 
 (Ibid.)
 

 3.
 
 Failure to Object to Prosecution’s Argument
 

 Defendant contends trial counsel should have objected to certain remarks by the prosecutor in her closing argument to the jury. He characterizes those remarks as (1) suggesting that the jury did not bear full responsibility for the decision, to impose death, (2) arguing that lack of remorse is an aggravating factor, and (3) referring to facts not in evidence.
 

 a.
 
 Jury’s Responsibility for Death Penalty Decision
 

 In her closing argument to the jury, the prosecutor contrasted defendant’s legal rights against defendant’s failure to recognize any of the rights of Mary Frances Litovich. The prosecutor noted that defendant had the right to counsel, to a jury trial, to being proven guilty beyond a reasonable doubt, and “the right to appellate review to see that we don’t make any mistakes on the law and the procedure in this case.” Seizing on the prosecution’s passing reference to appellate court review, defendant argues the prosecution violated the constitutional prohibition against leading the sentencing jury “to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.”
 
 (Caldwell
 
 v.
 
 Mississippi
 
 (1985) 472 U.S. 320, 328-329 [105 S.Ct. 2633, 2639, 86 L.Ed.2d 231].) Not so.
 

 The prosecutor very briefly referred to appellate court review as she was describing the various legal rights to which defendant was entitled (see
 
 People v. Sanders
 
 (1995) 11 Cal.4th 475, 554 [46 Cal.Rptr.2d 751, 905 P.2d 420] [arguments are reviewed in context]); she mentioned appellate review only in the context of legal and procedural mistakes, and she then reminded the jury of the duty of each of its members to come to a “personal decision.” Under these circumstances, it is unlikely that the prosecutor’s passing reference to appellate review led the jury to believe that it was relieved of
 
 *187
 
 responsibility for the verdict.
 
 (.People
 
 v.
 
 Hardy
 
 (1992) 2 Cal.4th 86, 211-212 [5 Cal.Rptr.2d 796, 825 P.2d 781];
 
 Jefferies
 
 v.
 
 Blodgett
 
 (9th Cir. 1993) 5 F.3d 1180, 1192.)
 

 b.
 
 Lack of Remorse
 

 In her argument to the jury, the prosecutor said: “Defendant has no conscience; and let’s talk about how bad he feels. You know that within hours after burning this lady alive, he was bragging about it.
 

 “ 'I burned your momma. Did you find my boots under her bed?’
 

 “It was a joke to him. Did he care? Was there one ounce of remorse about what he had done to this woman?”
 

 We reject defendant’s claim that through these comments the prosecutor impermissibly argued to the jury that it could consider defendant’s lack of remorse as a nonstatutory aggravating circumstance. (See
 
 People v. Boyd
 
 (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782].) A prosecutor may properly comment on a defendant’s lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor.
 
 (People
 
 v.
 
 Proctor
 
 (1992) 4 Cal.4th 499, 545 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; see
 
 People
 
 v.
 
 Crittenden, supra, 9
 
 Cal.4th at p. 148.) Here, the prosecutor never suggested that the jury should consider defendant’s lack of remorse as a circumstance in aggravation.
 

 c.
 
 Arguments Regarding Facts Not in Evidence
 

 In closing argument to the jury, the prosecutor said that defendant had “the right to funds of the court to get any experts he wanted to get.” We need not, however, decide whether the prosecutor’s statement was improper or whether defense counsel’s failure to object to it constituted deficient performance. We perceive no prejudice. The comment was merely a fleeting reference, made in the course of the prosecutor’s listing of a number of legal rights to which defendant was entitled.
 

 At one point in her closing argument to the jury, the prosecutor also mentioned prison life in general in California. She said prisoners had access to libraries, television and videos; they could write and receive letters; and they could “even get married and have children.” Again, we need not here decide whether counsel’s failure to object constituted deficient performance. (See
 
 People v. Quartermain
 
 (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609,
 
 *188
 
 941 P.2d 788] [conditions of confinement are irrelevant to a jury’s penalty determination].) It is not reasonably probable the result here would have been different if the prosecutor had not made these remarks to the jury.
 
 (People
 
 v.
 
 Mayfield, supra, 5
 
 Cal.4th at p. 208.) The remarks were effectively countered when defense counsel in closing argument described prison conditions, recounting his numerous visits to inmates in maximum security prisons. Under these circumstances, defendant was not prejudiced by counsel’s failure to object to the prosecution’s comments in question.
 

 4.
 
 Effectiveness of Defense Counsel’s Closing Argument
 

 Defendant characterizes his trial counsel’s closing argument at the penalty phase as a “travesty.” He contends counsel’s argument was disjointed, did not relate to defendant personally, and did not ask the jury to consider lingering doubt. Trial counsel’s relatively brief closing argument, consisting of 16 pages of transcript, focused on racial prejudice in the imposition of the death penalty and on the death penalty not being imposed on certain serial killers whose conduct was arguably more heinous than defendant’s. The argument included a response to several points the prosecution had raised in its closing argument, and it contained an emotional plea to the jury to spare defendant’s life.
 

 As this court has observed, the “effectiveness of an advocate’s oral presentation is difficult to judge accurately from a written transcript, and the length of an argument is not a sound measure of its quality.”
 
 (People
 
 v.
 
 Cudjo, supra,
 
 6 Cal.4th at pp. 634-635.) We have reviewed defense counsel’s closing argument to the jury and are not persuaded that the argument fell below the standard of reasonably competent representation.
 
 (Ibid.)
 

 5. Defense Counsel’s Failure to Request Certain Jury Instructions
 

 Defendant faults his trial counsel for not requesting jury instructions on (a) the elements of offenses, lesser included offenses, and specific intent as to six violent unadjudicated criminal acts introduced by the prosecution as aggravating evidence; (b) the presumption of innocence and the requirement of unanimity; and (c) lingering doubt.
 

 a.
 
 Elements of Offenses, Lesser Included Offenses, and Specific Intent
 

 Section 190.3, factor (b), provides that in determining the appropriate sentence, the jury is to take into account criminal activity by the defendant that involved the use or attempted use of force or violence or the express or implied threat to use force or violence. Under this statute, the
 
 *189
 
 prosecution here introduced evidence of assaults by defendant, his brandishing of a firearm, his commission of robbery and attempted murder, and his attempt to dissuade a witness from testifying.
 

 The prosecution proposed that the trial court give the jury the standard instruction on proof of other criminal activity. (CALJIC No. 8.84.1.2.) That instruction stated that the jury could consider a prior criminal act as an aggravating circumstance only if the jury was satisfied beyond a reasonable doubt that defendant had committed the act. During the instruction conference between the court and counsel, defense counsel suggested that the court modify the instruction to allow for the possibility that the jury might be convinced that defendant committed some but not all of the criminal acts asserted by the prosecution. During the discussion, defense counsel stated to the court that it “should possibly have an instruction on each [act] individually and a definition of those particular crimes.” The prosecutor responded that if the defense wanted an instruction “on the elements of all the crimes, that’s fine.” To that, defense counsel subsequently said, “I am not asking for any specific instructions.”
 

 We reject defendant’s claim that trial counsel should have asked for jury instructions on the elements of the various offenses that the prosecution offered as prior criminal activity, on any lesser included offenses, and on specific intent. A trial court need not instruct on the elements of the offenses of prior criminal activity introduced at the penalty phase unless the defense so requests. This rule “recognizes that, for tactical reasons, defendants in the vast majority of cases do not want to risk highlighting prior violent crimes or alienating the jury with hypertechnical defenses to bad acts which otherwise seem clearly aggravating.”
 
 (People
 
 v.
 
 Tuilaepa, supra,
 
 4 Cal.4th at p. 592.) Here, defense counsel may well have decided as a matter of trial strategy not to highlight, for example, defendant’s putting a gun against the chest of victim Francisco Lopez and pulling the trigger without provocation. We find no ineffective representation.
 

 b.
 
 Presumption of Innocence and Requirement of Unanimous Verdict
 

 Defendant faults his counsel for not requesting jury instructions on the presumption of innocence and requiring unanimity among the jury as to the truth of unadjudicated crimes. Because the trial court instructed the jury that the unadjudicated offenses had to be proven beyond a reasonable doubt, a presumption of innocence instruction was unnecessary.
 
 (People
 
 v.
 
 Rodrigues
 
 (1994) 8 Cal.4th 1060, 1190-1191 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The law does not require jury unanimity as to prior criminal acts introduced at the penalty phase of a capital trial as evidence of an aggravating factor.
 
 *190
 

 (People v. Jennings
 
 (1988) 46 Cal.3d 963, 988 [251 Cal.Rptr. 278, 760 P.2d 475].)
 

 c.
 
 Lingering Doubt
 

 Defendant criticizes trial counsel for not asking the trial court to instruct the jury that it could consider any lingering doubt it may have had about his guilt. Counsel’s failure to request such an instruction does not demonstrate deficient performance. Given the horrific facts surrounding the murder of Mary Frances Litovich and the jury’s relatively quick determination of defendant’s guilt, trial counsel may have had tactical reasons for not again focusing the jury’s attention on the guilt phase evidence.
 

 B.
 
 Instructional Error
 

 Defendant accuses the trial court of making numerous instructional errors at the penalty phase, both by failing to give certain instructions and by giving inappropriate instructions. We consider these claims in order, and we conclude they are without merit.
 

 Defendant faults the trial court for not instructing the jury that defendant’s age was a mitigating factor. Chronological age, however, is neither aggravating nor mitigating, “but is used in the statute ‘as a metonym for
 
 any
 
 age-related matter suggested by the evidence or by common experience ....’”
 
 (People
 
 v.
 
 Arias, supra,
 
 13 Cal.4th at p. 188.) The prosecutor’s argument here that defendant was old enough to understand the wrongfulness of his conduct is a permissible age-related inference.
 
 (Ibid.)
 
 Also permissible was the prosecutor’s reference to the victim’s age (65 years old), which is a circumstance of the offense admissible under section 190.3, factor (a).
 

 The trial court instructed the jury that to “return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.” (CALJIC No. 8.84.2 (1986 rev.).) Defendant contends the words “so substantial” in this instruction violate various federal and state constitutional provisions because they are impermissibly vague. Defendant further claims that the use of the word “warrant” is improper because it means “authorized” and directs the jury’s attention away from the crucial issue of whether a death sentence is “appropriate.” We have previously rejected identical contentions.
 
 (People v. Sanchez
 
 (1995) 12 Cal.4th 1, 81 [47 Cal.Rptr.2d 843, 906 P.2d 1129];
 
 People v. Breaux
 
 (1991) 1 Cal.4th 281, 315-316 [3 Cal.Rptr.2d 81, 821 P.2d 585].)
 

 
 *191
 
 Defendant next faults the trial court for not instructing the jury that (1) a sentence of life imprisonment is mandatory if the aggravating circumstances do not outweigh those in mitigation, (2) the jury must unanimously make separate findings on the truth of aggravating circumstances, and (3) the jury may not impose the death penalty unless it finds beyond a reasonable doubt that aggravating circumstances outweighed those in mitigation. We see no reason to reconsider our repeated rejection of these claims. (See, e.g.,
 
 People v. Sanchez, supra,
 
 12 Cal.4th at pp. 80-81.) We also reject defendant’s contention that the trial court had to instruct the jury it could return a verdict of life without possibility of parole even if it found that the aggravating circumstances outweighed the mitigating circumstances. The instructions given adequately conveyed to the jurors that they had to determine individually whether death is the appropriate penalty under all of the circumstances.
 
 (People
 
 v.
 
 Johnson
 
 (1992) 3 Cal.4th 1183, 1250 [14 Cal.Rptr.2d 702, 842 P.2d 1].)
 

 Finally, defendant contends the trial court should have instructed the jury that neither party bears the burden of persuasion on whether death or life without possibility of parole is the appropriate sentence. Defendant argues that without such an instruction the jury is “at best, confused, and at worst, adrift.” We disagree. The instructions given adequately conveyed to the jury the nature of the decision it was required to make.
 
 (People v. Johnson, supra,
 
 3 Cal.4th at p. 1250.) With the exception of other-crimes evidence, “the court should not have instructed at all on the burden of proving mitigating or aggravating circumstances.”
 
 (People v. Carpenter
 
 (1997) 15 Cal.4th 312, 418 [63 Cal.Rptr.2d 1, 935 P.2d 708];
 
 People
 
 v.
 
 Hayes
 
 (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376] [jury instruction that prosecution has burden of persuasion not required].)
 
 [6]
 
 Nor did the trial court err in not instructing the jury which factors it could consider in aggravation and which factors it could consider in mitigation.
 
 (People v. Kipp, supra,
 
 18 Cal.4th at pp. 380-381.)
 

 C.
 
 Constitutionality of Death Penalty Statute
 

 Defendant challenges the constitutionality of our death penalty law on the ground that it fails to perform the requisite narrowing function so as to provide a meaningful basis for distinguishing cases in which the death penalty is properly imposed from those in which it is not. We have repeatedly rejected this challenge. (E.g.,
 
 People v. Champion, supra, 9
 
 Cal.4th at p.
 
 *192
 
 951;
 
 People v. Crittenden, supra, 9
 
 Cal.4th at pp. 154-155.) We again do so here.
 

 • Defendant also asserts that section 190.3, factors (a), (b), and (k), are unconstitutionally vague. Although he concedes that the United States Supreme Court has rejected the claim that factors (a) and (b) are unconstitutionally vague
 
 (Tuilaepa v. California
 
 (1994) 512 U.S. 967, 973 [114 S.Ct. 2630, 2635-2636, 129 L.Ed.2d 750]), defendant asserts that his challenge to these factors is based on their purported failure to provide guidance to the jury on how to distinguish a death-worthy case from one that is not. Defendant’s argument confuses the narrowing role of special circumstances with the jury’s individualized selection function of aggravating and mitigating factors. The narrowing role of distinguishing a death-worthy case from one that is not is fulfilled by special circumstances. The purpose of the sentencing selection factors set forth in section 190.3 is to guide the jury’s discretion in deciding the appropriate penalty, not to distinguish a death-worthy case from one that is not.
 
 (People v. Bacigalupo
 
 (1993) 6 Cal.4th 457, 465-466 [24 Cal.Rptr.2d 808, 862 P.2d 808].) We earlier rejected, at pages 188-189,
 
 ante,
 
 defendant’s additional claim that factor (b), which allows the jury to consider prior criminal activity involving force or violence, is impermissibly vague in the absence of a requirement of unanimity.
 

 Defendant further claims that “empirical research” undermines the holding of the United States Supreme Court in
 
 Boyde v. California
 
 (1990) 494 U.S. 370, 381-382 [110 S.Ct. 1190, 1198-1199, 108 L.Ed.2d 316], and the holding of this court in
 
 People
 
 v.
 
 Kaurish
 
 (1990) 52 Cal.3d 648, 705 [276 Cal.Rptr. 788, 802 P.2d 278], that “some version of the [section 190.3,] factor (k) instruction is sufficient to guide the jury” concerning mitigating factors. We reject defendant’s claim. Defendant’s challenge misapprehends the nature of the capital case penalty phase. Under our system, a penalty phase jury performs an essentially normative task. As the representative of the “community at large, the jury applies ‘its own moral standards to the aggravating and mitigating evidence’ ” to determine if death or life “ ‘is the appropriate penalty for [that] particular offense and offender.’ ”
 
 (People v. Bacigalupo, supra,
 
 6 Cal.4th at p. 470, quoting
 
 People v. Edelbacher
 
 (1989) 47 Cal.3d 983, 1037 [254 Cal.Rptr. 586, 766 P.2d 1].) Defendant’s attempt to isolate individual factors from their context is contrary to the essential nature of the capital case sentencing process. Also, defendant has not shown any relationship between this case and the alleged insufficiency of the factor (k) instruction given.
 
 [7]
 

 
 *193
 
 D.
 
 Jury Misconduct
 

 Defendant contends the trial court erroneously denied his motion for a new trial seeking to vacate the jury verdict of death because of jury misconduct. Defendant further contends the trial judge should have recused herself from ruling on his motion. We reject both contentions.
 

 1.
 
 Facts
 

 On May 26, 1988, the prosecution and the defense completed their penalty phase closing arguments and the jury began deliberating at 1:45 p.m. At 3:00 p.m., the jury submitted this written question to the trial court: “If the jury can’t come to a unanimous decision what is the next step and what will be the result?” The court responded by telling the jury “simply to follow the court’s instruction about deliberation and consideration of the factors in aggravation and mitigation and attempt to reach a verdict if you can do so.” At 4:30 p.m., the court dismissed the jury for the day. At 9:00 a.m. the next day, jury deliberations resumed. At 10:15 a.m., the jury told the bailiff it had reached a verdict.
 

 On June 1, 1988, outside the presence of defendant and defense counsel, the prosecutor informed the court that after the verdict one of the jurors had told her that during deliberations a newspaper article about death penalty reversals was mentioned, and the subject of parole was raised. The prosecutor asked the court for the addresses and telephone numbers of the jurors so she could interview them about these matters. The court granted the request and suggested that the prosecutor inquire of the jurors whether the discussion had affected any of the jurors’ verdicts. The prosecutor audiotaped her interviews with the jurors.
 

 On June 15, 1988, the trial court granted a joint request by the prosecutor and defense counsel for an evidentiary hearing to inquire into possible juror misconduct. After tapes of the juror interviews were provided to the court and to defense counsel, the prosecution and defense counsel questioned each of the 12 jurors.
 

 
 *194
 
 The jurors indicated basic agreement on some details of their deliberations and disagreement on other details. They acknowledged discussing the possibility of defendant’s release on parole, they recalled some mention of a newspaper article about the reversal of a death penalty conviction, they recounted that three or more jurors had warned the others not to speculate about what would happen to defendant in the future, and they mentioned that the juror who had mentioned the newspaper article was reminded by other jurors of her duty not to consider anything she had read in the newspapers or watched on television that could affect this case.
 
 [8]
 
 The jurors also mentioned their consideration of the aggravating and mitigating factors in this case, particularly with respect to the murder
 
 of
 
 Mary Frances Litovich and the attempted murder of Francisco Lopez.
 

 The jurors differed significantly, however, on the time they thought they had spent discussing the possibility of defendant’s release from prison in the future. The time estimates ranged from “the whole day” on Thursday, May 26, to “off and on, but not for a long time,” to not talking about it at all on Thursday. Some jurors said that in an initial poll taken shortly after the commencement of deliberations six jurors had voted for life without possibility of parole and six jurors for the death penalty; then, on the Thursday in question, after the court’s response to the jury’s question, the vote was 10 to two in favor of the death penalty. According to other jurors, no additional balloting occurred until the next day.
 

 After reviewing the jurors’ testimony, the trial court denied the motion. The court found no jury misconduct with respect to the jurors’ discussion of defendant’s possible release on parole. The court pointed out that (1) the jurors were told not to speculate about what might happen to defendant in the future, and that they were to follow the instructions of the court; (2) during the death-qualification portion of voir dire the court had informed the jurors at various times that life without possibility of parole meant exactly that; and (3) defense counsel in closing argument mentioned the disparity in sentencing and the consequences of penalty verdicts in general.
 

 The trial court found no prejudice to defendant from the jury’s discussion of defendant’s possible release on parole, because the discussion was brief, the jury’s focus was on the facts of the case as well as on the aggravating and mitigating factors, and in its discussion the jury recognized “the fact that both a death sentence and a life without parole sentence could possibly result
 
 *195
 
 in” defendant’s release from prison. In the court’s words, the “jurors testified and the court finds that testimony credible that they repeatedly and consistently rejected the notion that future consequences of their decision should be a part of their deliberations.” We perceive no error.
 

 2.
 
 Propriety of Trial Court’s Ruling on Jury Misconduct
 

 In resolving a question of whether jury misconduct occurred, we “accept the trial court’s credibility determinations and findings on questions of historical fact if supported by substantial evidence.”
 
 (People v. Nesler
 
 (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87].) Juror misconduct raises a rebuttable presumption of prejudice. The presumption may be rebutted by proof that prejudice did not actually result.
 
 (People
 
 v.
 
 Majors
 
 (1998) 18 Cal.4th 385, 417 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)
 

 Defendant contends the jury’s discussion of the possible parole was prejudicial jury misconduct because, according to him, the jury mistakenly believed that sentencing him to death would be the only means of ensuring that he would never be released from prison. On this record, we conclude the jury did not engage in misconduct, and the jury’s brief discussion of the possibility of parole did not prejudice defendant.
 

 “ ‘The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system.’ ”
 
 (People v. Riel, supra,
 
 22 Cal.4th at p. 1219.) We accept the trial court’s determination here that the parole discussion was for “a very brief period of time and that most of the discussion focused on the facts of the case and factors in aggravation and mitigation.” Substantial evidence supports this finding. (See
 
 People v. Nesler, supra,
 
 16 Cal.4th at p. 582.) Also, the challenged discussion on the possibility of release on parole is similar to jurors’ comments during the penalty phase deliberations about the absence of executions in California. Such comments are not jury misconduct.
 
 (People
 
 v.
 
 Majors, supra,
 
 18 Cal.4th at pp. 421-422;
 
 People
 
 v.
 
 Cox
 
 (1991) 53 Cal.3d 618, 696 [280 Cal.Rptr. 692, 809 P.2d 351].) Furthermore, here the jury’s discussion of parole was prompted by matters intrinsic to the trial, namely, defense counsel’s comments in closing argument.
 
 [9]
 

 
 *196
 
 Even if viewed as misconduct, the jury’s brief discussion of the possibility of parole did not prejudice defendant. As we recently stated: “Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no
 
 substantial likelihood
 
 that one or more jurors were actually biased against the defendant.”
 
 (In re Hamilton
 
 (1999) 20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600].) The record here rebuts the presumption of prejudice. As we have noted, the discussion of possible parole was brief, and during the discussion several jurors reiterated the importance of not speculating as to what might happen to defendant in the future. As the trial court noted, because here the jury recognized “the fact that a death sentence and a life without possibility of parole sentence could possibly result” in defendant’s release from prison, the discussion did not contribute to the jury’s decision to impose the death penalty instead of life without possibility of parole. We agree with the trial court that under these circumstances the jury’s parole discussion did not prejudice defendant.
 

 3.
 
 Trial Judge Disqualification
 

 Defendant contends the trial judge acted improperly in having an ex parte meeting with the prosecutor on the question of jury misconduct, and therefore principles of fundamental fairness and due process required the judge to recuse herself from hearing defendant’s motion for a new trial.
 

 As we mentioned earlier, after the penalty phase verdict, the prosecutor appeared before the trial court ex parte to report the possibility of juror impropriety in penalty phase deliberations. The trial court thereafter scheduled an evidentiary hearing on the issue, with counsel for both parties present. (See
 
 ante,
 
 at p. 193.) At the beginning of that hearing, the trial judge prohibited counsel from asking the jurors whether any comments made during deliberations had influenced their verdict. (See Evid. Code, § 1150.) Later, just before the trial judge ruled on the claim of jury misconduct, defense counsel asked that she recuse herself from the proceedings because of the prosecutor’s ex parte appearance reporting the possible jury misconduct issue. In response, the trial judge noted that the prosecutor’s appearance was brief and on the record; that it is not uncommon for counsel to contact
 
 *197
 
 and interview jurors after a verdict; and that the investigation of the possible juror misconduct initiated by the prosecution was of benefit to defendant.
 

 Code of Civil Procedure section 170.1, subdivision (a)(2), states that a judge who “gave advice to any party in the present proceeding upon any matter involved in the action or proceeding” shall be disqualified. Under subdivision (a)(6) of that statute, a judge should recuse himself or herself if “a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial.” The trial judge here did not violate these statutory provisions. The one and one-half pages of transcript reporting the prosecutor’s ex parte appearance before the trial judge reveal a relatively brief statement by the prosecutor summarizing her discussion with the juror in question (see
 
 ante,
 
 at p. 193), followed by her request to the judge to release to her the names and addresses of the jurors so she could conduct an inquiry into the matter, which in turn was followed by the judge’s comment that an inquiry into possible jury misconduct would be a means of determining whether any juror had been improperly influenced in reaching a verdict of death.
 

 The brief ex parte discussion between the trial judge and the prosecutor occurred after the jury’s penalty verdict. Nothing in that brief exchange suggests any lack of impartiality by the trial judge. The judge did not in any way intimate or otherwise suggest any possible outcome of the jury misconduct investigation. The judge’s suggestion to the prosecutor that the inquiry into possible jury misconduct consider the effect on the verdict, a subject she herself later ruled inadmissible, did not constitute the kind of advice within the contemplation of the judge recusal provision in Code of Civil Procedure section 170.1. The judge’s fleeting comment was at most a suggestion, rather than the rendition of advice. The record does not indicate any bias whatever on the part of the trial judge. A person aware of these facts would not reasonably entertain a doubt about the judge’s impartiality. For the same reasons, any technical violation of the Canons of Judicial Ethics (Cal. Code Jud. Ethics, canon 3B(7); former Cal. Code Jud. Ethics, canon 3A(4)) that may have occurred was inconsequential, having no effect on the fairness of the proceedings or defendant’s right to due process.
 

 VII.
 
 Sentencing Issues
 

 Defendant accuses his trial counsel of incompetence for failing to argue for modification of the death verdict. (§ 190.4, subd. (e).) But counsel did so argue. Lead defense counsel referred the court to the defense brief on the motion for new trial in which the defense presented its view that the jury
 
 *198
 
 would have imposed a sentence of life without possibility of parole but for the jury’s asserted misunderstanding regarding the possibility of defendant’s release on parole. And associate defense counsel asked the trial court to modify defendant’s death sentence to a sentence of life without possibility of parole because of defendant’s youth, because of the mitigating testimony of defendant’s mother and sister at the penalty phase, and because the jury “only wanted to make sure that Mr. Mendoza spent the rest of his life in prison.” We also reject defendant’s contention that trial counsel should, in addition to the motion for new trial, have filed written points and authorities in support of the automatic motion to modify the death sentence. (See
 
 People
 
 v.
 
 Diaz
 
 (1992) 3 Cal.4th 495, 575 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [written briefing permissible but not obligatory].) Equally meritless is defendant’s claim that defense counsel did not cite and discuss any legal authority in the motion for new trial. Counsel did. As to defendant’s claim that defense counsel should have cited federal case law on constitutional issues, this court’s decisions on federal constitutional issues are controlled by and reflect pertinent holdings of the United States Supreme Court and defendant has not cited any holding of the high court that would have been dispositive here had defense counsel relied on such authority.
 

 Defendant also faults his counsel for suggesting to the trial court that it defer ruling on the automatic motion to modify the jury’s death verdict until submission of a probation report. The court did indeed do so. In ruling on the motion, the court stated that it had read the probation report. A probation report is a matter that is not before the jury. In ruling on an automatic motion to modify a verdict of death, the trial court is to consider only the evidence before the jury, and a probation report does not fall within that category.
 
 (People
 
 v.
 
 Crittenden, supra,
 
 9 Cal.4th at p. 151.)
 

 The error here, if any, however, did not prejudice defendant. The record shows that the trial court independently reviewed the evidence and concluded that defendant was guilty of the murder and the special circumstances beyond a reasonable doubt. The court then independently reviewed the aggravating and mitigating factors, concluding “that the factors in aggravation beyond all reasonable doubt outweigh those in mitigation and, further, the court independently finds that the evidence in aggravation is so substantial as compared to the evidence in mitigation that it warrants death and not life without possibility of parole.” Under the circumstances, there is no reasonable possibility that the trial court’s error, if any, affected its decision on the automatic motion to modify the jury’s death verdict.
 
 (People v. Crittenden, supra, 9
 
 Cal.4th at pp. 151-152.)
 

 
 *199
 
 VIII.
 
 Disposition
 

 The judgment is affirmed.
 

 George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 Appellant’s petition for a rehearing was denied November 1, 2000.
 

 [1]
 

 A11 statutory references are to the Penal Code unless otherwise indicated.
 

 [2]
 

 In case No. A779116, defendant was charged with the attempted murder and robbery of Francisco Lopez. The trial court in this case, No. A778709, denied the prosecution’s request to consolidate the cases.
 

 [3]
 

 Defendant argues that the evidence at trial of gang membership supports his assertion that the trial court abused its discretion in consolidating the charges at the time of its ruling. We review the trial court’s decision “ ‘in light of the showings then made and the facts then known.’ ”
 
 (People v. Marshall, supra,
 
 15 Cal.4th at p. 27.) The evidence of gang membership was introduced at trial, after the trial court’s consolidation ruling. Accordingly, we consider defendant’s gang membership argument in connection with his contention that he was deprived of due process at trial.
 

 [4]
 

 For the same reason, we reject defendant’s contention that the trial court prejudicially erred by not again admonishing the venire on April 18.
 

 [5]
 

 Before the passage of Proposition 115 in the June 5, 1990, Primary Election, the permissible scope of voir dire included examination directed towards the exercise of peremptory challenges. Proposition 115 changed the scope of legitimate inquiry on voir dire by requiring that the examination of prospective jurors be conducted only in aid of the exercise of challenges for cause. (See
 
 People v. Noguera, supra, 4
 
 Cal.4th at p. 646.)
 

 [6]
 

 We have previously held that the jury need not provide a written statement of its reasons for returning a verdict of death. (E.g.,
 
 People
 
 v.
 
 Kipp, supra,
 
 18 Cal.4th at p. 381;
 
 People
 
 v.
 
 Rodrigues, supra,
 
 8 Cal.4th at p. 1192.) Defendant here has not given a persuasive reason for reconsidering those holdings.
 

 [7]
 

 The trial court here gave the expanded section 190.3, factor (k) instruction, which allows the jury to consider “[a]ny other circumstance which extenuates the gravity of the crime even
 
 *193
 
 though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant’s character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial” and to “disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle.”
 

 [8]
 

 The jury’s discussion of the possibility of defendant’s release on parole at some future date apparently was prompted by defense counsel’s closing argument that defendant should not be punished more severely than serial killers such as the Boston Strangler and New York’s Son of Sam, who were not given death sentences.
 

 [9]
 

 Defendant criticizes the trial court’s ruling on his new trial motion for not separately addressing the jury’s discussion of a newspaper article mentioning the reversal of a death penalty judgment. A review of the transcript indicates that the trial court considered the
 
 *196
 
 newspaper article issue as part of and subsumed by the overall issue of the jury’s parole discussion. In any event, the record shows that the reference to the newspaper article was very brief and was immediately followed by observations from various jurors that the article was not to be considered, because the verdict had to be based on the evidence presented in this case.