Filed 3/27/13  P. v. Camacho CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B239570 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA107670) |
| v. | |
| ROBERTO CAMACHO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Laura R. Walton, Judge.  Affirmed.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

# INTRODUCTION

Following trial, a jury found defendant and appellant Roberto Camacho (defendant) guilty of gross vehicular manslaughter and fleeing the scene of an accident. On appeal, his appointed counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) requesting that this court independently review the entire record to determine if there are any issues, which if resolved in defendant's favor, would require reversal or modification of the judgment. Accordingly, we notified defendant that he could brief any grounds of appeal, contentions, or arguments he wanted us to consider. In a response, defendant submitted a supplemental brief contending that under Penal Code section 1181, subdivision 8,[1] we should reduce his gross vehicular manslaughter conviction because the evidence was insufficient to support a finding that he acted with the requisite recklessness. He also requests that we appoint new counsel to brief several additional issues on appeal.

Based on our review of defendant's supplemental brief and the entire record, we hold that the jury's finding that defendant acted with the requisite recklessness was supported by substantial evidence and therefore deny defendant's motion to reduce his sentence. We also deny defendant's request to appoint new counsel on appeal because he provides no showing of good cause or authority.

# FACTUAL BACKGROUND[2]

On June 7, 2009, at approximately 1:00 a.m., Itziar Romo was driving near the intersection of Atlantic Avenue (Atlantic) and Martin Luther King, Jr. Boulevard (Martin

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Under the applicable substantial evidence standard of review discussed below, we state only the facts that supported the guilty verdict on the gross vehicular manslaughter charge.

Luther King). Her husband, Raul, was in the front passenger seat.[3] She was driving northbound on Atlantic toward Martin Luther King. There was a 7-Eleven store on her right and a Chevron gas station on her left. She noticed a black and white police patrol car in the parking lot of the 7-Eleven.

After Itziar passed through the intersection at Martin Luther King, she noticed a maroon van traveling in the opposite direction on Atlantic. She was traveling at approximately 40 to 45 miles per hour. The speed of the van caught her attention. She estimated that it was traveling 90 to 100 miles per hour when it passed her.[4] As the van passed, it made a loud "vroom" sound. The speed of the van shocked her. She saw two men in the front seats of the van. She told her husband, "That guy's going to kill somebody" and "Little does he know that there's a cop right there."

In her rearview mirror, Itziar saw the van enter the intersection at Martin Luther King traveling 90 to 100 miles per hour and then saw an "explosion." According to Itziar, the traffic light was red when the van entered the intersection.

After she saw the collision, Itziar made a u-turn and went to the accident site. The car that had been struck by the van was "split in half," with one half in the middle of the intersection and the other half near the Chevron station. She saw a man still conscious in the front half of the car. She also saw the van in the intersection. In addition, she observed a police officer holding a man on the ground and saw a shadowy figure run from the driver's side of the van across the street.

On the morning of the collision, Raul was riding in the passenger seat of a car being driven by his wife, Itziar. They were traveling on Atlantic near the intersection with Martin Luther King. On the right side of Atlantic, Raul saw a 7-Eleven store.

After Raul's car passed through the intersection, he noticed a van "going pretty fast." When the van passed, Raul could feel "the wind . . . pretty hard." Raul's car was

---

[3]     For clarity, we refer to Itziar Romo and Raul Romo by their first names.

[4]     An investigating officer testified that the speed limit for that portion of Atlantic Avenue was 35 miles per hour.

traveling at 45 or 50 miles per hour and he estimated that the van was traveling as fast as 90 miles per hour.

As soon as the van passed, Raul heard Itziar say "Little does he know there's a cop waiting for him" and "He's going to kill somebody." Raul didn't see the collision, but turned around when his wife said, "I think he killed somebody," and saw smoke and "a bunch of dust."

Raul and Itziar made a u-turn and when they arrived at the intersection, Raul exited the car. He saw "the gentleman that passed away"[5] in one-half of a car in the middle of the intersection.

On June 7, 2009, at approximately 1:00 a.m., Los Angeles County Deputy Sheriff Paul Ocampo was on routine patrol near the intersection of Atlantic and Martin Luther King. He pulled into a 7-Eleven store parking lot on the southeast corner of the intersection at Atlantic and Martin Luther King. As he looked for a parking space, he glanced to his left and saw a burgundy colored minivan driving south on Atlantic at a high rate of speed collide with a Honda. The van pushed the Honda south through the intersection. The collision caused the Honda to "split apart." The van skidded to a stop on Atlantic just south of Martin Luther King.

As Deputy Ocampo drove toward the site of the collision, he saw defendant exit the driver's side of the van. Defendant appeared startled and shaken up. The deputy, who was 10 to 15 feet away from defendant, saw defendant look at him and then run west toward a Chevron gas station. As Deputy Ocampo pursued him, defendant looked back at the deputy three or four times. Defendant, whose head was shaved, had a large tattoo on the back of his head. Defendant ran through the Chevron station parking lot toward a wall which he scaled. The deputy made a radio dispatch to his partners informing them that a suspect was fleeing from him.

---

[5]     A coroner testified that the driver of the car struck by defendant's van died of multiple blunt force injuries.

Deputy Ocampo next noticed Alejandro Salgado climbing out of the front passenger side of the van. Salgado was arrested and transported to the Sheriff's station where he was interrogated.

During the interrogation, Salgado provided the following information about the traffic collision. On the night before the traffic collision, Salgado went to defendant's house in Moorpark, ate with him and his family, and then picked up some girls. They drove to Los Patreros nightclub in Southgate. As Salgado and defendant drove to the nightclub, they drank a twelve-pack of Pacifico beer. At the club, they each drank ten more beers. After about three hours of drinking, they both were drunk and defendant asked Salgado to leave with him. In response, Salgado said, "you're fucking faded. You're fucking drunk. Just wait." Salgado also told defendant that he did not "even know [his] fucking way [home]."

Nevertheless, Salgado entered defendant's car, left the nightclub with defendant driving, and proceeded down Atlantic Avenue. Salgado again advised that defendant did not know "where the hell [they] were going."

Defendant was traveling at least 45 miles per hour on Atlantic. At the intersection where the collision occurred, Salgado believed the light was green and that the other driver also had a green light. Salgado speculated that the other driver "probably thought he could catch us before we went but we were probably coming too fast for him." The other driver made a left turn and "met [the van] right at the wheels, boom."

According to Salgado, defendant's driver's side air bag deployed, but the passenger side bag did not. Defendant "got out of the car" and left the scene. Salgado tried to exit the van, but the front passenger door would not open. As he tried to climb out of the window, a deputy arrived and told him not to run. Defendant was later apprehended.

# PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendant in count 1 with murder in violation of section 187, subdivision (a); in count 2 with gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a); in count 3 with driving under the influence causing injury in violation of section 23153, subdivision (a); and in count 4 with leaving the scene of an accident in violation of Vehicle Code section 20001, subdivision (a). As to counts 1, 2, and 3, the District Attorney alleged that after committing those offenses, defendant fled the scene of the crime within the meaning of Vehicle Code 20001, subdivision (c). The District Attorney also alleged that defendant suffered a prior conviction for which he served a prior prison term within the meaning of section 667.5, subdivision (b) and suffered a prior conviction of a violent or serious felony within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i).

Following trial, the jury found defendant guilty on count 2 of the lesser included offense of gross vehicular manslaughter in violation of section 192, subdivision (c)(1). The jury also found defendant guilty on count 4 of fleeing the scene of an accident. Because the jury was deadlocked on counts 1 and 3, the trial court declared a mistrial as to those two counts. Defendant admitted the prior prison term enhancement. The trial court then scheduled a pretrial conference as to counts 1 and 3 and continued sentencing to the same date.

Jury selection for the retrial on counts 1 and 3 commenced, but before the jury was empanelled, defendant entered into a plea agreement pursuant to which he agreed to admit an allegation that he fled the scene of the accident within the meaning of Vehicle Code section 20001, subdivision (c), which allegation was added by interlineation to the amended information as to count 2.

Pursuant to the plea agreement, the trial court sentenced defendant on count 2 to a term of eight years, comprised of a middle term three-year sentence, plus an additional consecutive five-year term pursuant to the Vehicle Code section 20001, subdivision (c)

enhancement. In addition, the trial court imposed a concurrent one-year term under section 667.5, subdivision (b). The trial court also imposed, but stayed, a four-year sentence on count 4. Pursuant to the plea agreement, the trial court dismissed counts 1 and 3.

## DISCUSSION

Defendant contends that his conviction on the gross vehicular manslaughter charge required a showing that he drove recklessly and with conscious disregard of the risk of injury or death. According to defendant, because the evidence showed that he entered the intersection on a green light at a speed of no more than 45 miles per hour, it did not support a finding that he acted with the requisite recklessness. He therefore requests that we reduce his conviction on count 2 to negligent vehicular manslaughter.

### A.    Legal Principles

Defendant's request to reduce his gross vehicular manslaughter conviction is made pursuant to section 1181. "[S]ection 1181 does not confer upon this court the power to substitute its judgment as to choice of penalty for that of the trier of fact. We thus may not reduce a . . . defendant's sentence . . . , unless that sentence is contrary to the law or to the evidence, even if we were to disagree with the jury's penalty determination. (E.g., *People v. Hines* [(1997)] 15 Cal.4th [997,] 1078-1080.) Rather, '[a]bsent prejudicial error or legal insufficiency of evidence, this court must uphold the jury's verdict . . . .' (*Id.* at p. 1080.)" (*People v. Jennings* (2010) 50 Cal.4th 616, 687.) "[W]e ask whether 'there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.' (*People v. Mendoza* (2000) 24 Cal.4th 130, 175 [99 Cal.Rptr.2d 485, 6 P.3d 150].) [¶] In assessing such a claim, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the

7

defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) 'The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia*[, *supra*,] 443 U.S. 307, 317-320.)' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618] (*Rodriguez*).) [¶] Moreover, as observed in *Rodriguez*: 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].) "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment*.'" [Citations.]'" [Citation.]' (*Rodriguez, supra*, 20 Cal.4th at p. 11, italics added; see generally *People v. Clark* (2011) 52 Cal.4th 856, 942-943 [131 Cal.Rptr.3d 225, 261 P.3d 243] (*Clark*), and cases cited.)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.)

On count 2—gross vehicular manslaughter while intoxicated in violation of section 191.5, subdivision (a)—defendant was convicted of the lesser included offense of gross vehicular manslaughter in violation of section 192, subdivision (c)[6] which required

---

[6] Section 192, subdivision (c) provides in pertinent part: "Manslaughter is the unlawful killing of a human being without malice. It is of three kinds: [¶] . . . [¶] (c) Vehicular—[¶] (1) Except as provided in subdivision (a) of Section 191.5, driving a vehicle in the commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence."

a showing that he acted with gross negligence. "We have previously explained that '[g]ross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] "The state of mind of a person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.'" [Citation.] The test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved. [Citation.]' (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036 [2 Cal.Rptr.2d 8, 819 P.2d 849] [hereafter *Bennett*].)" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1204.)

## B.   Analysis

### 1.   *Recklessness*

Contrary to defendant's assertion, the evidence of his recklessness was substantial, even if there was conflicting evidence. Under the applicable standard of review we are required to apply, we only look to the evidence supporting the conviction to see if it was substantiated. The evidence consisted of the following: Two eyewitnesses estimated that defendant entered the intersection traveling 90 miles per hour. One of those witnesses observed that the light was red when defendant entered the intersection. There was also evidence that the speed limit for that portion of Atlantic Avenue was 35 miles per hour. Based on that evidence, which was reasonable, credible, and of solid value, a reasonable trier of fact could have concluded that defendant was aware of the risk posed by entering an intersection against a red light—and even with a green light—at nearly three times the speed limit and that he acted with conscious indifference to the consequences. The evidence was therefore sufficient to support a finding that defendant acted with the requisite recklessness. Accordingly, we deny defendant's request to reduce his sentence.

9

## 2. *Appointment of New Counsel*

Defendant maintains that if we reject his request to reduce his gross vehicular manslaughter conviction, we should appoint new counsel to brief several other issues on appeal. But defendant's request for new counsel is unsupported by any showing of good cause and does not include any citation to authority. We therefore deny his request to appoint new counsel.

## 3. *Record Review*

In addition to considering defendant's submission, we examined the entire record to determine if there are any other arguable issues on appeal. Based on that independent review, we have determined there are no other arguable issues on appeal. We are therefore satisfied that defendant's appointed counsel has fully satisfied his responsibilities under *Wende, supra,* 25 Cal.3d 436.

## DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

ARMSTRONG, J.

10